Rockingham
No. 83-520

### JOHN F. CLARIDGE & a.

v.

### NEW HAMPSHIRE WETLANDS BOARD

November 30, 1984

*Kearns, Colliander, Donahue and Tucker P.A.*, of Exeter (*David S. Brown* on the brief and orally), for the plaintiffs.

*Gregory H. Smith*, attorney general (*George Dana Bisbee*, assistant attorney general, on the brief and orally), for the State.

BATCHELDER, J. The plaintiffs, John and Winifred Claridge, appeal a superior court ruling that the New Hampshire Wetlands Board's denial of a permit to place fill on their property in Rye does not constitute a compensable taking of property. We affirm the trial court's ruling.

In 1979, the Claridges applied for a fill permit from the wetlands board. After a hearing, the application was denied. The Claridges

appealed to the superior court in accordance with RSA 483-A:4. The court referred the matter to a Master (*R. Peter Shapiro*, Esq.), who took testimony and viewed the property. The master's findings and rulings were approved by the Court (*Gray*, J.), which held that the board's denial of the permit was not unreasonable, unlawful or unjust and that the decision of the wetlands board did not exceed the police power so as to constitute a taking without compensation. *See* RSA 483-A:4, I, II; 31:77 (Supp. 1983). The Claridges appeal the findings and rulings made on the inverse condemnation question.

In 1971, the Tilton Inn, Inc. purchased the property in Rye. The Claridges were the sole stockholders of the Tilton Inn, Inc., and originally intended to build a home there for their retirement. The Claridges took title to the land in their own names in 1975.

In 1977, the Claridges arranged to sell the undeveloped land to Lauren Ramsdell, subject to the buyer's obtaining approvals from State and local agencies to permit a house to be built on the property. The sale fell through when Ramsdell's application to the wetlands board for a fill permit was denied.

The Claridges' property borders on a tidal creek in Rye. The creek drains into the ocean via a tunnel beneath Route 1A. Most of the property is composed of saltmarsh vegetation and woods. The majority of the other lots bordering this tidal creek have already been improved.

The Claridges' 1979 application for a fill permit was intended as a step towards building a one-family dwelling on the property. They needed fill to install a septic tank and construct a leachfield which would satisfy the regulation of the State Water Supply and Pollution Control Commission (WSPCC) that requires leachfields and septic tanks to be set back 75 feet from surface waters. CODE OF ADMINISTRATIVE REGULATIONS Ws 1007.03 (adopted pursuant to RSA 149-E:3 (Supp. 1983)). The fill was to be placed in the creek along the Claridges' property so that the sewage facilities would comply with the 75 feet setback rule.

In adopting the master's recommendation, the court found that the property, as a buildable lot, would be worth in excess of $50,000 if all regulatory hurdles to building could be satisfied. The court denied, however, the Claridges' requested finding that they have been deprived of any and all economic benefits from the property and that the land as regulated is valueless. The court also found:

> "The property is not generally conducive for swimming, hunting, fishing, boating, farming or timber production. Its only use might be to clear a portion of the property to enable the location of a travel trailer or tent for seasonal use

. . . . In its present posture, the property could be sold to abutters or utilized for limited seasonal use."

The court found the property to be part of a valuable ecological resource and that filling would do "irreparable damage to an already dangerously diminished and irreplaceable natural resource."

■ The standard of review on appeal from a court-approved master's recommendation is that the findings and rulings will be upheld unless they are unsupported by the evidence or are erroneous as a matter of law. *Summit Electric, Inc. v. Pepin Brothers Const., Inc.,* 121 N.H. 203, 206, 427 A.2d 505, 507 (1981).

■ A review of the record substantiates the relevant findings of the master. The direct testimony of expert witnesses supports the findings of the ecological value of the property in its unchanged state and the destructive effect of the proposed fill. The master's view of the scene would justify a finding that the land will support some, though limited, recreational use. There is also evidence in the record that tends to show that the land could be sold to abutters, that a leachfield could, perhaps, be installed by way of easements to neighboring properties, or that other sewage disposal techniques could be tried. This evidence supports the finding that the land continues to have some economic value. Therefore, the court's denial of the Claridges' requested finding that the land has no economic value was not error.

There is no evidence in the record to support the court's finding that the land could be cleared and used for a trailer or a tent. The court's other findings, nevertheless, support the conclusion that the property continues to have some economic value. Accordingly, we will not vitiate the master's conclusion. *See Preston v. National Grange Mut. Ins. Co.,* 114 N.H. 212, 215, 317 A.2d 787, 789 (1974).

Turning to the inverse condemnation questions, we hold that no taking has occurred under either the fifth or fourteenth amendments to the United States Constitution, or part I, article 12 of the New Hampshire Constitution.

The master's recommendation, relying on our holding in *Sibson v. State,* 115 N.H. 124, 336 A.2d 239 (1975), rules that denial of the permit was a valid exercise of the police power and did not require compensation. The Claridges argue that *Sibson* was an anomaly which either was overruled by *Burrows v. City of Keene,* 121 N.H. 590, 432 A.2d 15 (1981) or should today be overruled. Because of the importance of plaintiffs' argument and the need for clear guidelines in this area, we begin our analysis with a review of *Burrows v. City of Keene supra* before re-examining *Sibson v. State supra.*

*Burrows v. City of Keene supra* considered the question whether Keene's designation of the plaintiffs' property as part of a conservation district constituted a taking requiring compensation under the State or Federal Constitutions. In that case, the plaintiffs, in 1973, purchased 124 acres of woodland in Keene for the purpose of subdividing it into lots. The property was located in a rural zone in which subdivision was permitted. In 1975, the plaintiffs approached the Keene Planning Board and the city's conservation commission about a subdivision plan. The city responded by requesting time to arrange to purchase the land so that the city could preserve its open spaces. The city offered the plaintiffs $27,000 for the land, based on an appraisal predicated on the city's intended noncommercial use of the land. The parties were unable to agree on price, and, when the plaintiffs submitted further subdivision plans, those plans were denied. In 1977, the city amended its zoning ordinance to include 109 acres of the plaintiffs' 124 acres in a conservation district in which development was forbidden. The suit in *Burrows v. City of Keene supra* claimed inverse condemnation by the city's regulation.

*Burrows v. City of Keene supra* held that the city's action constituted a taking under part I, article 12 of the New Hampshire Constitution. Citing other authority, the court observed that the right to just compensation for a taking of property necessarily limits the police power and that the government cannot, through regulation, indirectly effect a taking without paying compensation. *Id.* at 596–97, 432 A.2d at 18–19. Not every regulation of private property, the court continued, constitutes a taking: "Reasonable regulations that prevent an owner from using his land in such a way that it causes injury to others or deprives them of the reasonable use of their land may not require compensation." *Id.* at 598, 432 A.2d at 19 (citing *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 144–45 (1978) (Rehnquist, J., dissenting) (quoting *Mugler v. Kansas*, 123 U.S. 623, 668–69 (1887))); *Sibson v. State*, 115 N.H. at 128, 336 A.2d at 242.

> "[R]easonable zoning regulations which restrict economic uses of property to different zones and which do not substantially destroy the value of an individual piece of property [do not] effect a taking requiring compensation. But arbitrary or unreasonable restrictions which substantially deprive the owner of the 'economically viable use of his land' in order to benefit the public in some way constitute a taking within the meaning of our New Hampshire Constitution requiring the payment of just compensation. (Citations omitted) . . . The owner need not be deprived of all valuable use of his property. If the denial of use is substan-

tial and is especially onerous, a taking occurs. There can be no set test to determine when regulation goes too far and becomes a taking."

*Burrows v. City of Keene, supra* at 598, 432 A.2d at 19–20.

The court in *Burrows*, 121 N.H. at 600, 432 A.2d at 21, concluded that "[f]rom the outset, it was plain that the city wished that the plaintiffs' land be devoted to open space," and, instead of paying for this result, obtained it by "prohibit[ing] all 'normal private development.'" *Burrows v. City of Keene supra* specifically distinguished itself from *Sibson v. State*, 115 N.H. 124, 336 A.2d 239 (1975), in that *Burrows* involved a regulation of development of average woodland, a use of property traditionally not deemed injurious to the public, whereas in *Sibson* the development of wetlands was deemed injurious to the public because of the unique nature of a vanishing resource. *Burrows, supra* at 601, 432 A.2d at 21. The language in *Burrows v. City of Keene*, 121 N.H. at 601, 432 A.2d at 21, stating that "to the extent *Sibson* is inconsistent with our present holding, it is overruled" should be read merely to limit and not to overrule it entirely. *Sibson* considered the more general principles of inverse condemnation later applied in *Burrows*, and found them inapplicable to the situation in which the public policy advanced by the regulation is particularly important and the landowner's action would substantially "change the essential natural character of [the] land so as to use it for a purpose for which it was unsuited in its natural state and which injures the rights of others." *See Sibson v. State*, 115 N.H. at 129–30, 336 A.2d at 243 (quoting *Just v. Marinette County*, 56 Wis. 2d 7, 17, 201 N.W.2d 761, 768 (1972)).

■ Where *Sibson* applies, the regulation will not cross the threshold of a taking without a showing that the owner's substantial, justified expectations concerning the property are thwarted and that the burden of the State's action being cast upon that property owner is unreasonably onerous.

■ ■ "Property," in the constitutional sense, is not the physical thing itself but is rather the group of rights which the owner of the thing has with respect to it. *Burrows v. City of Keene*, 121 N.H. at 597, 432 A.2d at 19 (citing *United States v. General Motors Corp.*, 323 U.S. 373, 377–78 (1945)). The term refers to a person's right to "possess, use, enjoy and dispose of a thing and is not limited to the thing itself." *Burrows v. City of Keene*, 121 N.H. at 597, 432 A.2d at 19 (citing *Metzger v. Town of Brentwood*, 117 N.H. 497, 502, 374 A.2d 954, 957 (1977)). The extent to which a regulation "has interfered with distinct investment-backed expectations" is a particularly rele-

vant consideration in determining when a taking has occurred. *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124 (1977).

██ ██ A person who purchases land with notice of statutory impediments to the right to develop that land can justify few, if any, legitimate investment-backed expectations of development rights which rise to the level of constitutionally protected property rights. *See, e.g., Biggs v. Town of Sandwich*, 124 N.H. 421, 428, 470 A.2d 928, 932 (1984) (plaintiffs' knowledge of a town ordinance which barred their right to obtain a permit to fill wetlands, and the plaintiffs' decision to build without a permit in the face of that risk, rendered any hardship that they suffered self-imposed); *cf. Metzger v. Town of Brentwood*, 117 N.H. 497, 374 A.2d 954 (1977) (plaintiffs' notice that the town's frontage requirement might prohibit their building on their property did not bar the plaintiffs from challenging the constitutionality of the ordinance as arbitrary and unreasonable). The State cannot be guarantor, via inverse and condemnation proceedings, of the investment risks which people choose to take in the face of statutory or regulatory impediments.

Turning to the case before us, we note that before the purchase of the property in question by the plaintiffs' corporation, New Hampshire had adopted several statutes regarding dredging and filling in wetlands, as well as septic system approval near surface waters. A 1967 statute required a permit from the WSPCC by any person seeking to install sewage disposal systems within 1,000 feet of surface waters. Laws 1967, 147:13 (codified at RSA 149-E:3). Another 1967 statute required dredge and fill permits by any person seeking to undertake construction in the surface waters of the State (Laws 1967, ch. 254 (codified at RSA 149:8-a)), or seeking to dredge or fill any bank, flat, marsh or swamp in or adjacent to tidal waters of the State (Laws 1967, ch. 215 (codified at RSA 483-A:1)). In 1969, the WSPCC was empowered to reject septic system applications where the concentration of such systems in an area was already high. Laws 1969, ch. 102 (codified at RSA 149-E:3 (Supp. 1983)). Also, in that year, the powers over tidal water fill permits were moved from the New Hampshire Port Authority to the New Hampshire Water Resources Board. Laws 1969, ch. 387 (codified at RSA 483-A:3).

In 1963, New Hampshire adopted enabling legislation authorizing cities and towns to form conservation commissions. Laws 1963, ch. 168 (codified at RSA ch. 36-A (Supp. 1983)). That law permitted towns, upon approval of a town meeting, to establish a conservation commission for the protection of watershed resources. Such commissions were charged with indexing all open marshlands, swamps and other wetlands, and were empowered to recommend to the select-

men or the New Hampshire Department of Resources and Economic Development a program for better promotion, development or utilization of such areas.

By 1971, the town of Rye had adopted the provisions of RSA ch. 36-A. Before purchasing the property involved in this case, the Claridges received a letter from the Rye Conservation Commission advising them that they would need approval to place fill on the property. At the time of purchase, the court found, the Claridges had some knowledge that they would need approval of the Rye Conservation Commission in order to place fill on the property. The court also found that the land was subject to State wetlands regulation at the time the land was purchased by the plaintiffs' corporation in 1971.

At the time of that purchase, the Claridges had constructive notice that the property was subject to State wetlands statutes, that any septic system they might install would have to meet the WSPCC setback requirements, and that filling in wetlands would require wetlands board approval. They had actual notice that any proposal to fill the wetland would have to be approved by the Rye Conservation Commission. The tenor of those regulations, in combination with one another, reflects a strong public policy against the filling of saltmarshes and mandates careful public scrutiny of applications to fill such areas. By the time the Claridges actually applied for the fill permit in question in 1979, the WSPCC regulations had been codified and published pursuant to New Hampshire's administrative procedure act (RSA ch. 541-A).

The denial of a fill permit by the wetlands board, as found by the master, prevented a fundamental change in the surrounding wetland. He found that the proposed filling of this marsh would have irreparably diminished the marsh's nutrient-producing capability for coastal habitats and marine fisheries. These changes attendant to the plaintiffs' proposed filling clearly pose a risk to others and harm to the public.

The dangers associated with filling wetlands have only recently become widely known. However, the public policy of the State has recognized the importance of these wetlands, and strong regulations to protect wetlands have been enacted. The regulations call for some sacrifices from all, in that land otherwise ideally situated for private development is effectively rendered unavailable for that purpose. Clearly, the burden which these plaintiffs must shoulder from this regulation is more direct and more acute than that of the public at large.

However, the relevant question is whether the plaintiffs'

burden is unreasonably onerous. First, we note that others who own wetland property, whose lots are too small to accommodate septic systems without extensive landfill, will suffer the same kind of burden as the Claridges. Second, the denial of this permit very directly promotes the State's clearly enunciated policy of protecting the State's wetland resources. Finally, the burden imposed is not different in kind or result from that embodied in the risk which the Claridges chose to take in buying this lot with notice of regulatory impediments and in waiting to develop the property in the context of growing public concerns about wetland resources. Under the circumstances of this case, given the nature of the State's interest and the plaintiffs' limited constitutionally protectable "property interest" in the right to develop this lot into a building lot, we conclude that the burden on these plaintiffs is not unreasonably onerous and that, accordingly, no taking has occurred.

*Affirmed.*

KING, C.J., and DOUGLAS, J., concurred specially; the others concurred.

KING, C.J., with whom DOUGLAS, J., joins, concurring specially: While I agree with the majority opinion, I disagree with the conjectural reasoning of both the master and the majority opinion that the land could be sold to abutters or could be used for a tent. Such restricted use is of little solace to an owner who purchased the land on which to construct a house. The theoretical incentive for an abutter to purchase the land or for a person to utilize the land for a tent drastically minimizes, if it does not destroy, the value of the land. The minimal value of the land must be reflected in the assessed value of the land for real estate tax assessments.