Rockingham
No. 84-464

### The State of New Hampshire Wetlands Board

### v.

### Charlotte Marshall, Individually and as Trustee of The Drop Anchor Realty Trust

### AND

### Joseph J. Fiumara, Individually and as Agent of The Drop Anchor Realty Trust

August 16, 1985

*Stephen E. Merrill*, attorney general (*George Dana Bisbee*, assist-ant attorney general, on the brief and orally), for the State.

*Steven Eric Feld,* of Portsmouth, by brief and orally, for the defendants.

DOUGLAS, J. This is an appeal of two actions, consolidated in the superior court, involving salt marsh property belonging to the Drop Anchor Realty Trust (Drop Anchor) in the town of Hampton. The first action is an appeal from the denial by the New Hampshire Wetlands Board (the board) of Drop Anchor's application to fill this marsh. The second action arises out of the State's petition for injunctive relief and for civil penalties against Drop Anchor through its sole trustee, Charlotte Marshall, and against Drop Anchor's agent, Joseph Fiumara (the defendants), for their having filled part of the salt marsh property while the denial of a permit to fill that property was pending appeal in superior court.

After a hearing on the State's petition for preliminary injunction, the Superior Court (*Nadeau,* J.) temporarily restrained Drop Anchor, by its trustee and/or agent, from placing any additional fill or performing any construction activities on the subject property. The court thereafter consolidated these two cases. After a hearing, it affirmed the permit denial, permanently enjoined the defendants from filling their property, and assessed penalties totalling $7,000. We affirm.

On January 21, 1981, Drop Anchor applied to the board for a permit to fill a portion of its property along Ocean Boulevard in Hampton. The area subject to the request is part of a 72,300-square-foot tract of land purchased by Drop Anchor in 1973. Located on this property are a single-family residence, four wood-frame motel buildings, a two-story wood-frame building containing rental units, and a swimming pool.

The board initially rejected Drop Anchor's application. In response to the defendants' motion, the board held a "rehearing," following which, on May 19, 1981, it reaffirmed its prior rejection of the Drop Anchor application. The board's denial of the application was based on its findings that:

 (a) the area to be filled is a prime unaltered salt marsh;

 (b) the area is inundated daily by sea water and percolation of the sea water through the peat;

 (c) prime salt marsh is among the most productive regions of the world. It also produces useable energy which is necessary for the maintenance of the coastal fisheries;

 (d) the marsh's effectiveness as a pollution filter (buffer) would be reduced if the proposed permit was granted;

(e) compaction would affect the percolation characteristics of the area to be filled and therefore may alter ph.

The defendants appealed the board's decision to the superior court on June 16, 1981, pursuant to RSA 483-A:4, I, and RSA 31:77.

While awaiting the appeal proceedings, the defendants subdivided the property into three lots. The subdivision was approved by the Hampton Planning Board. On the advice of an attorney that the subdivision took a part of the property out of the jurisdiction of the board, defendant Fiumara began filling in the middle lot, lot 2. During the course of the fill activity on November 5, 1983, defendant Fiumara was advised orally by the wetlands board's senior coastal inspector, Frank D. Richardson, to cease placing fill on the property. In spite of the inspector's directive, Mr. Fiumara continued to fill the salt marsh. The fill has not been removed from the property. It was in reaction to this activity that the State petitioned for injunctive relief and civil penalties against the defendants.

The two cases were consolidated in the superior court, and a hearing on the merits of the two actions was conducted over several days beginning on February 28, 1984. In its final ruling, the Court (*Nadeau*, J.) denied the defendants' appeal of the wetlands board's action, finding that the denial of the permit was a reasonable and lawful exercise of the State's police power, and that it did not constitute a taking. The court also issued a permanent injunction against the defendants, requiring them to remove the fill illegally placed on the property and to cease any additional filling or construction activity thereon. The court further ordered that Drop Anchor and its agent, Joseph Fiumara, each pay a civil penalty of $3,500 to be used in restoration of the salt marsh. Any portion of the fine in excess of the restoration cost was to be returned to the trust and Mr. Fiumara in equal proportions.

Before the superior court, the defendants asserted that by subdividing the property and leaving a narrow unfilled area between Beach Pond, the tidal water, and lot 2, Drop Anchor filled an area which no longer bordered tidal water and over which, therefore, the wetlands board no longer had jurisdiction. The court held that in reviewing the reasonableness of the board's decision, it must assess the board's denial of the fill permit in light of the facts then before the board, which in this case did not include the later subdivision of the property. The court then went on to find that "at the time of Drop Anchor's application the Board acted within its jurisdiction and correctly held that the proposed fill area bordered tidal water." The court added, however, that "[e]ven were the court to consider Drop Anchor's property as subdivided, its findings would not change."

After the defendants' three post-trial motions were denied by the court, they filed this appeal. Although the defendants raise numerous issues, they mainly contend that: (1) the wetlands board has no jurisdiction over the disputed property because it meets neither of the definitions of wetlands established by RSA 483-A:1-a; (2) the denial of their petition to fill constituted a taking for which they are entitled to compensation; and (3) the trial court erred in assessing civil penalties against Drop Anchor and its agent.

■■ We begin by noting that the findings of the board are prima facie lawful and reasonable on appeal. RSA 483-A:4; RSA 31:78 (Supp. 1983). Moreover, the trial court must let the board's denial stand unless it finds "by the balance of the probabilities, on the evidence before it, that the decision was unlawful or unreasonable." *Richardson v. Town of Salisbury*, 123 N.H. 93, 96, 455 A.2d 1059, 1061 (1983); RSA 31:78 (Supp. 1983).

The defendants first challenge the court's ruling that the wetlands board has jurisdiction over their property. Critical to the jurisdictional issue is the interpretation of RSA 483-A:1-a, I, which defines "wetlands." The statute provides:

> "Without limiting RSA 483-A:1, the waters and adjacent areas within this state to which this chapter applies are defined as follows:
>
> I. Wherever the tide ebbs and flows, it shall apply to all lands submerged or flowed by mean high tide as locally determined, and, in addition, to those areas which border on tidal waters, such as, but not limited to, banks, bogs, salt marsh, swamps, meadows, flats or other lowlands subject to tidal action (including those areas now or formerly connected to tidal waters) whose surface is at an elevation not exceeding 3-1/2 feet above local mean high tide and upon which grow or are capable of growing some, but not necessarily all, of the following: salt meadow grass (Spartina patens), spike grass (Distichlis spicata), black grass (Juncus gerardi), salt-marsh grass also known as cordgrass (Spartina alterniflora) . . . . The occurrence and extent of salt-marsh peat at the undisturbed surface shall be evidence of the extent of jurisdiction hereunder within a salt-marsh."

If property comes within this definition, it is subject to the jurisdiction of the board.

■ Two kinds of land are included within the statute: (1) lands submerged or flowed by mean high tide; and (2) lands bordering

tidal water, subject to tidal action, whose elevation does not exceed three and one-half feet above mean high tide and upon which grows, or is capable of growing, some of the specified vegetation. *State v. McCarthy,* 117 N.H. 799, 801, 379 A.2d 1251, 1251–52 (1977). In the present case, the court found that the defendants' land is not submerged or flowed by the mean high tide, so that the first definition is inapplicable. It concluded, however, that the property does qualify as a wetland under the second definition, and we find adequate evidence in the record to support this determination.

■ The defendants argue that the filled area of Drop Anchor's property, lot 2, does not "border" tidal water and therefore does not fit within the statutory definition of a wetland. They contend that by subdividing the property in such a way as to situate lot 1 between Beach Pond, the tidal water, and lot 2, they have created a buffer zone so that lot 2 no longer borders tidal water. We agree with the trial court that we are not obliged to answer this question since it was not before the board. We address it, nevertheless, in the interest of judicial economy and hold that the defendants may not erode wetlands protection by manufacturing artificial boundaries.

In the first place, such action clearly contravenes the purpose of the statute to protect and preserve tidal waters and wetlands. The legislature has recognized that these areas are habitats, and valuable sources of nutrients, for plants, fish, and wildlife; that they provide recreational, aesthetic, and commerical value to the public; and that they contribute to flood and pollution control. RSA 483-A:1-b. The defendant's property, including lot 2, is a viable part of the Hampton salt marsh and is the type of land which the legislature sought to protect. RSA 483-A:1-a. Certainly the legislative intent would be undermined if an owner were allowed to remove land from the jurisdiction of the agency charged with its protection, merely by redrawing boundaries and creating a "buffer zone." If an owner's property is, or was, part of an area which is contiguous to tidal water, that land borders tidal water regardless of any contrived severance on the part of the owner. The statute itself supports this interpretation by specifically including in its definition section "areas now *or formerly* connected to tidal waters." RSA 483-A:1-a (emphasis added); *see Sibson v. State,* 115 N.H. 124, 336 A.2d 239 (1975). Since lot 2 is part of a salt marsh which is contiguous to tidal water, it meets the jurisdictional requirement of bordering tidal water.

■ The record supports the court's findings that the defendants' land also meets the other three requirements of the second definition of wetlands in RSA 483-A:1-a. That the property is subject to tidal

action is evidenced by the fact that prior to the date fill was placed on it, lot 2 was inundated with tidal water on the average of 40 to 50 days each year. Moreover, the dominant vegetation in the area is *Spartina patens*, which grows only in areas subject to tidal action. The remaining vegetation likewise grows only in areas subject to tidal action, and the soils in the filled area consist of natural tidal marsh soils.

As to the third part of the wetlands definition, the court found that the lowest estimate of mean high tide for the area is 4.5 feet and that the highest point of elevation on the Drop Anchor property is 7.5 feet. Therefore, all of the defendants' property comes well within the statutory requirement of no more than 3.5 feet above mean high tide. As already mentioned, *Spartina patens* and other vegetation specified in the statute, such as spike grass and black grass, grow in the area, thus satisfying the fourth definitional requirement. The defendants' property, including lot 2, therefore meets the definition of wetlands under RSA 483-A:1-a and is subject to the jurisdiction of the wetlands board.

■ The second major issue presented here is whether the board's denial of the defendants' fill request constituted a taking without compensation in violation of the fifth and fourteenth amendments to the Federal Constitution and part I, article 12 of the State Constitution. "Controlling and restricting the filling of wetlands is clearly within the scope of the police power of the State." *Sibson v. State*, 115 N.H. at 126, 336 A.2d at 240. In order to determine whether the board's denial of the fill permit application was a valid exercise of the police power not requiring compensation, we will turn to a recent case dealing with an almost identical issue.

In *Claridge v. New Hampshire Wetlands Board*, 125 N.H. 745, 485 A.2d 287 (1984), the plaintiffs sought board approval for a permit to fill salt-marsh property, falling within the definition of wetlands under RSA 483-A:1-a, in order to install the septic system and leachfield necessary to accommodate a single-family home. The board denied their application, and its decision was upheld by the superior court. On appeal, we affirmed and held that in the case of wetlands "the regulation will not cross the threshold of a taking without a showing that the owner's substantial, justified expectations concerning the property are thwarted and that the burden of the State's action being cast upon that property owner is unreasonably onerous." *Id.* at 750, 485 A.2d at 290–91.

■ In *Claridge*, we specifically affirmed *Sibson*, a case also dealing with the wetlands board's authority to deny permission to fill salt-marsh property. In *Sibson*, we recognized the environmental

uniqueness of wetlands and its importance to the public health and welfare. Unlike many other property regulation situations, the filling of wetlands alters the property itself and changes its basic character, to the detriment of the public good. As we stated in *Sibson*, "'An owner of land has no absolute and unlimited right to change the essential natural character of his land so as to use it for a purpose for which it was unsuited in its natural state and which injures the rights of others.'" *Sibson, supra* at 129–30, 336 A.2d at 243 (quoting *Just v. Marinette County*, 56 Wis. 2d 7, 17, 201 N.W.2d 761, 768 (1972)).

In *Claridge*, we upheld a finding that filling the salt marsh in question would destroy much of the ecological value of the land by "irreparably diminish[ing] the marsh's nutrient-producing capability for coastal habitats and marine fisheries." *Claridge*, 125 N.H. at 752, 485 A.2d at 292. We also held that because the owners had both constructive and actual notice when they bought the property of State and municipal regulations which might interfere with their intended use of the property, the board's denial of their petition did not thwart substantial, justified expectations. *Id.* at 751–52, 485 A.2d at 291–92. Moreover, we did not consider the plaintiffs' burden to be unreasonably onerous since they were in the same position as other wetlands owners who were unable to build upon their property without extensive landfill. The burden upon the plaintiffs in *Claridge* was simply the type of risk "which [they] chose to take in buying this lot with notice of regulatory impediments . . . ." *Id.* at 753, 485 A.2d at 292.

For the purpose of inverse condemnation, or taking analysis, the present case is indistinguishable from *Claridge*. After several days of expert testimony, and a view of the property, the trial court found that the board's action prevented an injurious use of salt-marsh property, a unique natural resource of critical public importance. The court found that salt marshes serve as a source of nutrients in the coastal ecosystem, as a natural buffer against pollution, and a wildlife habitat. They also serve flood control, aesthetic, and recreational purposes. The court concluded that the impact of filling the defendants' property would be to eliminate each of these functions of the marsh. The extensive record in this case provides ample support for the court's findings.

As in *Claridge*, the defendants' substantial, justified expectations were not thwarted by the board's denial of their fill application. Drop Anchor purchased the property in 1973, six years *after* RSA chapter 483-A, the statute regulating wetlands, went into effect. The defendants at least had constructive notice that they

might not be able to alter the natural character of the salt marsh by filling it. "A person who purchases land with notice of statutory impediments to the right to develop that land can justify few, if any, legitimate investment-backed expectations of development rights which rise to the level of constitutionally protected property rights." *Claridge*, 125 N.H. at 751, 485 A.2d at 291.

 As in *Claridge* and *Sibson*, the owners here retained the same value and use of their property after, as before, the board's denial.

> "Its [the wetlands'] value was the same after the denial of the permit as before and it remained as it had been for milleniums. . . . [T]he board denied plaintiffs none of the normal traditional uses of the marshland including wildlife observation, hunting, haying of marshgrass, clam and shellfish harvesting, and aesthetic purposes. The board has not denied plaintiffs' current uses of their marsh but prevented a major change in the marsh that plaintiffs seek to make for speculative profit."

*Sibson, supra* at 129, 336 A.2d at 243. For the above reasons, we conclude that the burden on the defendants was not unreasonably onerous and that the board's denial of the defendants' fill application did not constitute a compensable taking of their property in violation of the State or Federal Constitutions. *Claridge, supra* at 748, 485 A.2d at 289.

 We next address whether the trial court erred in assessing civil penalties against the trust itself and its agent, Mr. Fiumara. RSA 483-A:6 provides that civil penalties may be assessed for "[f]ailure, neglect or refusal to obey a lawful order of the wetlands board." The defendants argue that they violated no order by the board regarding the filling of lot 2. They contend that the oral "warning" of the board's coastal inspector to cease and desist filling lot 2 was not an order by the board, so that they cannot be assessed penalties for disobeying the inspector. Whatever merit this argument might have, we need not consider it here. The defendants ignore the fact that the board had previously denied their fill permit application and that the defendants' appeal of this denial was pending before the superior court at the time they filled lot 2. This denial meets the requirement of a board order under RSA 483-A:6.

 Moreover, that statute provides that "[t]he court may, upon separate petition of the attorney general . . . levy upon any person who violates any provision of this chapter, whether or not he is the owner of the land in question, a civil penalty in an amount not

to exceed $5,000." *Id.* By this section, the issuance of an administrative order is not a precondition to the imposition of a civil penalty when a person acts in violation of RSA chapter 483-A. The defendants also challenge the amount of penalties assessed, stating that the combined total of $7,000 exceeds the statutory limit of $5,000 and is thus unlawful. The plain language of the statute is that *any person* may be fined $5,000. *See* RSA 483-A:4-a, II. The maximum penalty is aimed at each violator, not each violation, so that it was not error to impose two fines even though their total exceeded $5,000.

 The next error claimed with regard to the assessment of penalties is that the trust as an entity could not be fined because the attorney general did not petition for a separate penalty against the trust. The attorney general's petition was a complaint against Charlotte Marshall "individually and in her capacity as the sole trustee of the Drop Anchor Realty Trust." While the specific prayer requesting a penalty against defendant Marshall did not indicate whether the request was directed at her individually or as trustee, the court could properly find, taking the petition as a whole, that the request was directed at her in her fiduciary role, and therefore at the trust itself. The remainder of the petition referenced Charlotte Marshall "individually and in her capacity as the sole trustee of Drop Anchor Realty Trust." Moreover, the State requested in its petition that the court grant it "such other and further relief as may be deemed just and equitable."

 Finally, with regard to the propriety of assessing penalties in this case, the fact that the defendants may have filled the lot because their attorney advised that the subdivided land was no longer subject to the board's jurisdiction is a defense which they presented and which the court considered and properly rejected. The board's permit refusal could only be overturned on appeal to the superior court. RSA 31:77 (Supp. 1983). Also, although the defendants' lawyer had given his legal opinion that lot 2 was no longer within the jurisdiction of the board, he also advised them that "[f]illing the land could result in action being taken against you by the Attorney General's office and the planning board would probably be reluctant to grant any type of site plan approval until any pending litigation with the Wetlands Board was resolved."

The defendants raise numerous additional issues and, while we are not enamored with the shotgun approach to litigation, we now address most of those claims. First, the defendants argue that the board, by previously allowing neighboring properties to be filled, has acted inconsistently and arbitrarily in denying the instant request, in violation of defendants' substantive due process rights

under both the State and Federal Constitutions. We find that this issue was not properly raised either before the board or before the trial court, so we will not consider it on appeal. *Daboul v. Town of Hampton*, 124 N.H. 307, 309, 471 A.2d 1148, 1149 (1983).

Before the board, the defendants made a single reference to the board's treatment of a fill request on neighboring property, with no mention made of a constitutional claim. Nor was such a claim raised before the superior court. The evidence regarding neighboring properties which was introduced and offered by the defendants at trial was, as they explained, aimed at undermining the reasonableness of the board's decision or the credibility of the State's witnesses. In fact, on one occasion, the court specifically inquired whether the defendants intended to raise constitutional objections to the board's actions and they responded in the negative.

With regard to the evidence of neighboring properties being filled as it relates to the *reasonableness* of the board's decision, the defendants argue that because other landowners were allowed to fill, it was unreasonable for the board to deny their application. The trial court properly perceived this argument as an insufficient basis upon which to receive into evidence testimony about numerous other properties.

The defendants made no suggestion at trial, or on appeal, that the board had applied inconsistently the criteria used in wetlands permits decisions. In their brief, the defendants claim that the court's "refusal to consider the factual circumstances of the Board's actions approving at least some fill on *every* neighboring property that had applied clearly constitutes reversible error." (Emphasis added.) The record shows that this is not the evidence which the defendants sought to introduce. Moreover, under the circumstances of this case, the court was not obliged to hear testimony as to the treatment of other properties for the purpose of demonstrating unreasonableness on the part of the board.

The defendants further claim that RSA 483-A:1-a, I, is unconstitutionally vague and overbroad because it sets forth imprecise and incalculable scientific requirements. We see nothing vague or overbroad about the definitions in this statute which we discussed at great length above. The experts at trial appeared to have little difficulty determining whether the defendants' property met the statutory definitions. The actual point which the defendants seem to make with this argument is that the definitions should be changed. Mainly, they contend that the State's jurisdiction *should end* at mean high tide, a more readily discernible point, they claim, than 3-1/2 feet above mean high tide. Whether definitions other than those now

contained in the statute would be more appropriate is, of course, an issue which the defendants should raise with their legislators, not with this court.

■ The defendants next argue that the board's decision is unreasonable because the trial court repudiated the board's finding that "the area is inundated daily by sea water." As we have noted in the past with regard to appeals under RSA 31:74 to :87, the burden is to "show that the *order or decision* of the board is unreasonable or unlawful, not to show that the *findings* were unreasonable or unlawful." *Belanger v. City of Nashua*, 121 N.H. 389, 392, 430 A.2d 166, 168 (1981) (emphasis in original). Property need not be inundated daily to be subject to tidal action. As discussed above, there was ample evidence to show that the defendants' property was subject to tidal action.

Finally, the defendants challenge the procedure followed by the board in denying their application. They argue that the board was required by RSA 483-A:2 to conduct an evidentiary hearing before a decision was made on their application. In this case, the board made its initial decision without a hearing. The defendants then filed a motion for rehearing and, pursuant to that motion, the board for the first time held a hearing.

We have recognized that a rehearing does not afford a petitioner all of the rights of an initial or *de novo* proceeding:

> "An application for a rehearing of a prior determination is not a new proceeding but merely another step in the proceeding in which the prior determination was made. Its purpose is to direct 'attention to matters said to have been overlooked or mistakenly conceived in the original decision and thus invites a reconsideration upon the record upon which that decision rested.'"

*Lambert Constr. Co. v. State*, 115 N.H. 516, 519, 345 A.2d 396, 398 (1975) (quoting *Atchison Etc. Ry. Co. v. U.S.*, 284 U.S. 248, 260 (1932)) (citation omitted).

■ Assuming, without deciding, that the defendants were entitled to an initial hearing, these considerations are inapplicable in the present case since the "rehearing" was in fact a full evidentiary hearing at which the defendants were afforded every opportunity to present their case. The defendants therefore were not prejudiced by the board's initial denial of their application without a hearing, since any error was cured by the board's subsequent action. *See* 2 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 12.13 (2d ed. 1979).

*Affirmed.*

All concurred.