[Nos. 52165-4, 52529-3. En Banc. December 17, 1987.]

THE ORION CORPORATION, *Respondent,* v. THE STATE OF WASHINGTON, ET AL, *Appellants,* PADILLA BAY ASSOCIATES, *Respondent.*

622

*Kenneth O. Eikenberry, Attorney General,* and *Charles W. Lean, Assistant,* for appellant State.

*C. Thomas Moser, Prosecuting Attorney,* and *John R. Moffat, Chief Civil Deputy; Irene M. Hecht* and *William C. Smart* (of *Keller Rohrback*), for appellant Skagit County.

*Hillis, Clark, Martin & Peterson, P.S.,* by *Mark S. Clark, James J. Ragen, Joseph B. Genster,* and *Richard R. Wilson,* for respondents.

*Norm Maleng, Prosecuting Attorney for King County,* and *Phyllis K. MacLeod, Deputy; Patrick D. Sutherland, Prosecuting Attorney for Thurston County,* and *Thomas R. Bjorgen, Deputy; Douglas N. Jewett, City Attorney for the City of Seattle,* and *Dennis J. McLerran, Assistant; J. Richard Aramburu* on behalf of the Washington Environmental Council, amici curiae for appellants.

UTTER, J.—Orion Corporation filed this action in 1982, in part alleging an inverse condemnation by excessive regulation (regulatory taking). According to Orion, the Shoreline Management Act (SMA) and the Skagit County Shoreline Management Master Program (SCSMMP) had taken its

Padilla Bay tideland property without just compensation. In a previous appeal, we held that Orion need not exhaust its administrative remedies because under the regulatory scheme, Orion could not obtain a permit to make any reasonably profitable use of its property. *Orion Corp. v. State,* 103 Wn.2d 441, 457–60, 693 P.2d 1369 (1985) (*Orion I*). On remand after *Orion* I, the trial court added Padilla Bay Associates (PBA) as coplaintiff, and all parties moved for summary judgment on a variety of issues.

In the instant appeal, the State of Washington and Skagit County challenge summary judgment granted Orion on remand. Orion and PBA also assign error to several trial court rulings. The trial court rejected several procedural challenges and dismissed PBA's takings claim, along with all of Orion's claims except for the regulatory taking. We affirm each of these decisions. Concerning the regulatory takings claim, the trial court granted Orion summary judgment against both the State and the County, holding that the SMA and the SCSMMP had taken Orion's property without just compensation. In appealing the grant of summary judgment, the State and County raise three main issues: (1) what effect the public trust doctrine has on Orion's takings claim; (2) at what point, if ever, do land–use regulations become so excessive as to constitute a taking without just compensation; and (3) what remedy and measure of damages apply if such an unconstitutional taking occurs.

On the public trust issue, we affirm the trial court's conclusion that Orion purchased its tidelands subject to the requirements of the public trust doctrine. We remand, however, for the trial court to determine what effect the trust has on Orion's takings claim. On the question of whether an unconstitutional taking has in fact occurred, we reverse, but reach different conclusions concerning each appellant. Because the County acted as the State's agent, it has no individual liability, and thus must be dismissed as a party. As to the State, we conclude that several genuine issues of material fact exist, making summary judgment

improper. We therefore remand for resolution of the factual issues.

If upon remand the trial court determines that an unconstitutional taking has occurred, application of the regulatory regime to Orion's property is invalid. Because the taking is "temporary" and reversible, we hold that the State has the option of curing the taking or maintaining the status quo by exercising eminent domain. Regardless of how the State exercises its legislative prerogative, while the regulation remains effective, the state and federal constitutions require the State to pay just compensation in the form of the leasehold value of the land.

## FACTS

Padilla Bay, an area of approximately 11,000 acres, lies east of Anacortes, Washington. It is the most diverse, least disturbed, and most biologically productive of all major estuaries on Puget Sound. The Bay sustains a diverse and densely populated ecology, intensely important to a variety of life forms, including endangered species and a wide variety of commercially harvested species, such as juvenile salmon and Dungeness crab. Navigable at high tide, Padilla Bay has been used by the public for navigational and recreational purposes.

In 1963, Orion began purchasing tideland acreage for the purpose of dredging and filling Padilla Bay to create a residential, Venetian–style community. By 1968, Orion had acquired approximately 5,600 acres of tidelands. In 1971, Orion acquired options to purchase additional acreage.[1] Orion stockholders later assigned ownership of these options to a separate entity, Padilla Bay Associates. Orion's predecessors acquired the tideland acreage from the State during the early part of the 20th century. Early development efforts focused first on a diking district to create

---

[1]The parties dispute the exact amount of acreage under option. The options originally set a $600 per acre price, payments of $6,000 per year, and automatic renewal each year until 1991. Following PBA's renegotiation of its tideland options, the price per acre was reduced to $100.

farmland, but the project failed. Later, the focus turned to raising oysters, which proved profitable until the expansion of nearby pulp mills and their discharge of untreated wastes into the Bay.

Prior to 1969, various state and county officials expressed support for Orion's Venetian–style development proposal. To pursue its project, however, Orion had to obtain a permit from the Army Corps of Engineers.[2] Before Orion could proceed with its development plans, this court held that "the public has the right to go where the navigable waters go, even though the navigable waters lie over privately owned lands." *Wilbour v. Gallagher*, 77 Wn.2d 306, 315–16, 462 P.2d 232, 40 A.L.R.3d 760 (1969), *cert. denied*, 400 U.S. 878, 27 L. Ed. 2d 115, 91 S. Ct. 119 (1970). As a result of *Wilbour*, Governor Evans placed all tideland fill projects under a moratorium, which lasted until 1971, when the SMA was enacted.

The SMA identified Padilla Bay as one of five "shorelines of statewide significance," and declared that state policy required preservation and protection of designated shorelines. *See* RCW 90.58. Like other local jurisdictions, the SMA required Skagit County to formulate a master program to implement state policy and regulate its particular shorelines. Until the County formulated its program and received approval from the Department of Ecology (Ecology), regulations promulgated by Ecology governed the issuance of any shoreline development permits. Believing that the SMA precluded its project, Orion abandoned its Venetian–style development plan.

---

[2]After 1968, Corps regulations required an independent determination, with issuance of a permit depending on "an evaluation of all relevant factors, including the effect . . . on navigation, fish and wildlife, conservation, pollution, aesthetics, ecology, and the general public interest." 33 C.F.R. § 209.120(d)(1) (1969). Elsewhere, similar proposals were caught up in permit denials and litigation. *See, e.g.*, *Jentgen v. United States*, 657 F.2d 1210 (Ct. Cl. 1981), *cert. denied*, 455 U.S. 1017, 72 L. Ed. 2d 134, 102 S. Ct. 1711 (1982); *Deltona Corp. v. United States*, 657 F.2d 1184 (Ct. Cl. 1981), *cert. denied*, 455 U.S. 1017, 72 L. Ed. 2d 135, 102 S. Ct. 1712 (1982); *Zabel v. Tabb*, 430 F.2d 199 (5th Cir. 1970), *cert. denied*, 401 U.S. 910, 27 L. Ed. 2d 808, 91 S. Ct. 873 (1971).

In 1973, the county assessor valued Orion's land at $45 per acre, basing the appraisal on the original tideland use—oyster production. Because the assessor failed to take the SMA into account, Orion appealed and succeeded in having the assessed value reduced to $12 per acre. Over the next year, Orion rejected two separate joint venture proposals in aquaculture[3] on its property, both of which would have been permissible under the SMA guidelines in force at the time.[4] In late 1974, Orion rejected the State Department of Game's offer to purchase the tideland holdings for $90 per acre, a fair market value determined by a commercial appraisal firm.

By 1976 further development took place in the state regulatory regime. First, Ecology adopted the Washington State Coastal Zone Management Program (WSCZMP), which designated Padilla Bay an area of particular concern. While the WSCZMP made the state eligible for federal grants, it did not impose any new land–use restrictions or regulations. *Orion I*, at 449. Second, Ecology approved and adopted the SCSMMP as state regulation. WAC 173–19–010; WAC 173–19–370. The SCSMMP became the principal land use plan applicable to Orion's property. It designated Orion's property as "aquatic," a designation that foreclosed

---

[3]The Skagit County Shoreline Management Master Program defines aquaculture as "the farming or culture of food fish, shell fish, or other aquatic plants and animals in fresh or salt water areas, and may require development such as fish hatcheries, rearing pens and structures, and shellfish rafts, as well as use of natural spawning and rearing areas." SCSMMP ch. 3.03(8).

[4]We acknowledge that Padilla Bay is an area containing unique or fragile resources, which the WAC regulations indicated "should be left undeveloped." *Orion Corp. v. State,* 103 Wn.2d 441, 446, 693 P.2d 1369 (1985) (citing WAC 173–16–040(5)). The regulations, however, identified aquaculture as "a preferred, water–dependent use", WAC 173–16–060(2)(a)(vi), deserving of protection from other activities, which when "[p]roperly managed . . . can result in *long term* over *short term* benefit" "of *state–wide and national interest.*" (Italics ours.) WAC 173–16–060(2). Aquaculture met use preferences for statewide interest protection and long term benefit, both of which are listed as higher preferences than leaving fragile resources totally undeveloped. *See* WAC 173–16–040(5)(a)–(d). Therefore, there is every reason to believe that an aquaculture permit would have been issued to Orion when the WAC regulations controlled.

dredging and filling the tidelands, as Orion had intended. The only possible uses of any particular value were nonintensive recreation and aquaculture, the latter of which required a conditional use permit. *Orion* I, at 458–60.[5]

Having concluded that aquaculture was not economically feasible, Orion explored the possibility of selling its land to the State. Nevertheless, Orion refused an offer of $110 per acre made by an environmental group, The Nature Conservancy. In 1977, Ecology attempted to interest the United States Fish and Wildlife Service (USFWS) in purchasing Padilla Bay, but USFWS had no interest because existing state and federal regulations adequately protected the Bay's resources. Wilbur Hallauer, Ecology Director, suggested the State look for a way to compromise on the "takings" issue. Consequently, in 1978 Ecology initiated a serious effort to take advantage of a federal program under the Coastal Zone Management Act, which provided 50 percent of the funds necessary to fund establishment of estuarine sanctuaries.

Rather than pursuing formal condemnation proceedings, Ecology adopted a "willing seller" approach, under which tideland owners could either accept or reject the purchase offer without threat of a subsequent condemnation proceeding. A 1979 appraisal by a private firm concluded that the highest and best legal use of Orion's holdings was as marginal oyster land, and set an $80 per acre fair market value. Orion challenged the appraisal and commissioned its own, which valued the tidelands at $1,200 per acre, based on the assumption that the State had taken Orion's legal right to fill in its tidelands and reclaim it as farmlands.

---

[5]Even after formation and approval of the SCSMMP, Orion would probably have received an aquaculture use permit. *See Orion* I, at 457. We concluded in *Orion* I that "the State has made a conscious policy choice to preserve Padilla Bay in its natural state . . . [a] choice [that came] to fruition by the creation of the . . . Sanctuary." 103 Wn.2d at 457. While the State and County wanted to preserve Padilla Bay, the policy and regulations in effect prior to the Sanctuary reflect an intention only to foreclose Orion's plans to dredge, fill, and reclaim the tidelands, which would have destroyed their ecological and commercial value.

Although the parties again were stalemated, the Legislature took the necessary official steps and created the Padilla Bay Estuarine Sanctuary (the Sanctuary). Laws of 1980, ch. 180, § 1, p. 610. While the act did not designate any specific property constituting the Sanctuary, the EIS identified the proposed Sanctuary as including Orion's holdings. In August 1981, the State made its final offer of $100 per acre, which Orion rejected. Orion then instituted this suit.

Since that time the State has continued to purchase property for the Sanctuary. The underlying fee holders of acreage optioned by PBA sold their property to The Nature Conservancy for $45 per acre. The State then accepted the Conservancy's offer to purchase the property at cost for the Sanctuary, recognizing that while it could include the property in the Sanctuary, PBA maintained the right to exercise its purchase option. The now existing Sanctuary does not include Orion's property, nor is acquisition of the property critical for the Sanctuary's viability. However, maps and other promotional materials displayed for the public in 1982, and still available today, include Orion's property holdings within the proposed Sanctuary.

## Procedural History and Posture

In filing this action, Orion alleged a taking of its tidelands by excessive regulation without just compensation, a taking by physical invasion, a taking by abusive precondemnation conduct, and violation of its federal civil rights under 42 U.S.C. § 1983. After remand in *Orion I*, the trial court added as coplaintiff Padilla Bay Associates, actual owner of the tideland options. All parties moved for summary judgment. The trial court dismissed Orion's § 1983 claim, the claims of a taking by physical invasion and by abusive precondemnation conduct, and PBA's claim, which had alleged a taking of its purchase options. Also denied were State and County summary judgment motions based on the ripeness doctrine, the statute of limitations, and on Orion's alleged failure to join an indispensable party.

In granting Orion's motion for summary judgment on the regulatory takings claim, the trial court held that the SMA and the SCSMMP prevented Orion from making any reasonably profitable use of its land. Thus, a taking by excessive regulation occurred, requiring just compensation damages. In addition, the trial court found that a common law public trust doctrine existed in Washington when Orion purchased its property. Rather than precluding a taking from occurring, the trial court held that the trust merely limited Orion's damages. To allow this court the opportunity to review all issues decided to this point, the trial court postponed a separate damage proceeding. Nevertheless, the trial court characterized the taking as permanent and set the measure of damages at the diminution of value caused by the Sanctuary's creation. We granted review and approved the present alignment of the parties.

At the outset we note that all but one of the rulings challenged in this appeal came on summary judgment motions. Therefore, in reviewing the trial court's conclusions we must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party on each issue. *Wilson v. Steinbach,* 98 Wn.2d 434, 656 P.2d 1030 (1982).

## I
### PROCEDURAL CHALLENGES

Before reaching the main substantive issues raised by this appeal, we must consider numerous procedural challenges.

### A
### RIPENESS OF ORION'S REGULATORY TAKINGS CLAIM

■ Both the State and County moved for summary judgment, arguing that under recent United States Supreme Court decisions, Orion's claim is not ripe until it actually submits a shoreline development permit application to the County. *See MacDonald, Sommer & Frates v. Yolo Cy.,* 477 U.S. 340, 91 L. Ed. 2d 285, 106 S. Ct. 2561 (1986); *Williamson Cy. Regional Planning Comm'n v.*

*Hamilton Bank,* 473 U.S. 172, 87 L. Ed. 2d 126, 105 S. Ct. 3108 (1985); *see also United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 88 L. Ed. 2d 419, 106 S. Ct. 455 (1985). The ripeness requirement, however, is not a new development in regulatory takings jurisprudence. *See, e.g., Agins v. Tiburon,* 447 U.S. 255, 65 L. Ed. 2d 106, 100 S. Ct. 2138 (1980). In any event, we find that our decision in *Orion* I does not conflict with the federal ripeness requirement.

Under most circumstances, the Supreme Court will not find a takings claim ripe until the initial government decision maker has arrived at a definite position, conclusively determining whether the property owner was denied "all reasonable beneficial use of its property . . ." *Williamson Cy.,* 473 U.S. at 194. In *Orion* I, we held that after creation of the Sanctuary, Orion could not obtain a permit to make any reasonably profitable use of its property. 103 Wn.2d at 460. When a court concludes that a permit application for any use would be futile, the Supreme Court will find the regulatory takings claim ripe for review. *Yolo Cy.,* 477 U.S. at 352 n.8.

The State suggests we reconsider our *Orion* I conclusion in light of the more complete record developed upon remand. Pointing to new facts in the record, the State argues that Orion can obtain a development permit to conduct aquaculture on part of its tidelands. This new information includes: (1) a shoreline conditional use permit has issued for operation of hydraulic clam harvesting in tidelands of nearby Skagit Bay; (2) a viable Sanctuary exists without including Orion's property; (3) the pulp mill discharge which prevented successful oystering no longer presents a problem; (4) in an affidavit, the Director of Ecology's permit section concluded that aquaculture would be permitted in Padilla Bay; and (5) our decision, reached a few months after *Orion* I, approving a conditional use permit for a commercial dock located next to a wildlife refuge. *Nisqually Delta Ass'n v. DuPont,* 103 Wn.2d 720, 696 P.2d 1222 (1985).

While the State's new information may make it more likely that an aquaculture conditional use permit would have issued *prior* to the Sanctuary's creation, these facts have no bearing on our *Orion* I conclusion. There, we held that the existence of the Sanctuary would require denial of an aquaculture conditional use permit. *Orion* I, at 459. Under the SCSMMP, "only two uses are potentially conceivable on Orion's property, aquaculture and recreational use." *Orion* I, at 458. Recreational uses, however, "would provide Orion no economic return." *Orion* I, at 458. Aquaculture required a conditional use permit, which could not issue if the proposed use was incompatible with permitted activities in the area and would cause adverse effects to adjacent properties. *Orion* I, at 459. Because the adjacent property was the Sanctuary and Sanctuary activities included only research and recreation, we concluded that aquaculture would be incompatible, making issuance of a conditional use permit impossible. *Orion* I, at 459. Our subsequent decision in *Nisqually Delta* has no application here. There, we held that a commercial dock could be built next to a wildlife refuge in a shoreline of statewide significance, because issuance of the conditional use permit would not result in "unreasonable" adverse effects. *Nisqually Delta,* at 732–33. However, the commercial dock was to be built on land classified as urban, while Orion's land, classified as aquatic, is part of the same ecological unit as the Sanctuary.

We therefore continue to adhere to our *Orion* I conclusion, and hold that an application for a shoreline development permit remains futile, making Orion's takings claim ripe for review.

## B
### STATUTE OF LIMITATIONS

The County appeals the trial court's denial of its motion to dismiss on the basis of the statute of limitations. According to the County, Orion's action was untimely because a 3–year statute of limitations should apply to

Orion's claim of inverse condemnation by excessive regulation. We affirm the trial court's decision, noting that regardless of which time period applies, Orion's claim was not time barred.

Recently we recognized that "[i]t is well settled in Washington that where a taking occurs by eminent domain or by inverse condemnation, a landowner's right to seek just compensation may not be barred merely by the passage of time." *Valley View Indus. Park v. Redmond*, 107 Wn.2d 621, 631, 733 P.2d 182 (1987). To extinguish these types of claims, the government must gain title to the interest in question by way of adverse possession. *Valley View*, at 631; *Petersen v. Port of Seattle*, 94 Wn.2d 479, 483, 618 P.2d 67 (1980); *Highline Sch. Dist. 401 v. Port of Seattle*, 87 Wn.2d 6, 15, 548 P.2d 1085 (1976). However, "unlike eminent domain and inverse condemnation, regulatory takings . . . could never meet the elements of adverse possession." *Valley View*, at 631. Unless some statute of limitations applies, the State could never extinguish a regulatory takings claim. Under federal law, whenever land use regulations amount to a taking, the just compensation clause of the Fifth Amendment, as applied to the states through the Fourteenth Amendment, requires the government to pay the landowner the leasehold value for the use of the land. *See First English Evangelical Lutheran Church v. County of Los Angeles*, ___ U.S. ___, 96 L. Ed. 2d 250, 107 S. Ct. 2378, 2388 (1987). Consequently, in the absence of statutory limits, damages would continue to mount until the property owner chose to bring an action.

In support of a 3–year time limit, the County points to the general limit for property damage cases, RCW 4.16.080, and the United States Supreme Court's recent adoption of a 3–year limit for all § 1983 actions, regardless of their underlying characterization. *Wilson v. Garcia*, 471 U.S. 261, 85 L. Ed. 2d 254, 105 S. Ct. 1938 (1985). The Oregon Supreme Court adopted a 6–year limit for regulatory inverse condemnation actions. *Suess Builders Co. v. Beaverton*, 294 Or. 254, 656 P.2d 306 (1982). Although the

Oregon court relied on statutes that have no counterpart in Washington, our Legislature has adopted a 6–year limit on actions for the "use . . . of real estate." RCW 4.16.040. Another possibility would be to use the 10–year prescriptive period from the adverse possession statute without requiring the other adverse possession elements. *See* RCW 4.16.020.

As explained in our discussion of Orion's regulatory takings claim (see section III(D)), the Sanctuary's creation in August of 1980 was the operative date for a takings analysis. Orion's action, filed in 1982, comes within the federal 3–year limitation, as well as the 6–year and 10–year alternatives. Consequently, regardless of which time period we ultimately apply, Orion's action was timely.

## C
### Failure To Join Indispensable Party

After remand, the trial court denied the County's motion to dismiss for failure to join an indispensable party. CR 19. The County appeals, and argues that federal regulations in place after 1968 controlled Orion's ability to develop its tidelands, making the federal government an indispensable party to this action. Even assuming the validity of the County's argument, where a party cannot be joined, we must determine whether, in "equity and good conscience", the action should proceed. CR 19(b).

Orion could not join the federal government in state court. To bring a claim in excess of $10,000 for inverse condemnation under the Fifth Amendment, the claimant must file in the United States Court of Claims. 28 U.S.C. §§ 1346, 1491; *Reid v. United States,* 715 F.2d 1148, 1153 (7th Cir. 1983). If Orion filed its claim in the Court of Claims, it could not join the State and County. *See Boyd v. United States,* 207 Ct. Cl. 1, 4 n.1 (1975) (Court of Claims may only enter judgments against the United States), *cert. denied,* 424 U.S. 911, 47 L. Ed. 2d 314, 96 S. Ct. 1106 (1976). To avoid depriving Orion of any forum for its action, equity and good conscience require us to allow

Orion's action to continue without federal participation. CR 19(b).

## D
### STANDING OF PADILLA BAY ASSOCIATES

■ PBA claims that as an owner of unexercised options to purchase Padilla Bay tideland property, it has standing to bring an action for inverse condemnation by excessive land–use regulations. In dismissing PBA's claim, the trial court concluded that unexercised options to purchase tidelands "are not a sufficient property interest to support an award of damages for an unconstitutional taking." Clerk's Papers, at 2050. This conclusion conforms with the general rule, which views unexercised options as an insufficient interest to allege a taking regardless of the circumstances. *See* Annot., 17 A.L.R.4th 337, 463 (1982). We have rejected the general rule, choosing instead to resolve such claims by examining the circumstances and relation of the parties. *Spokane Sch. Dist. 81 v. Parzybok,* 96 Wn.2d 95, 633 P.2d 1324 (1981). PBA argues that it has standing to bring this action because the questions of equity and fairness that motivated our decision in *Parzybok* are present here. We disagree.

The circumstances surrounding the *Parzybok* option differ both conceptually and factually from the case at hand. *Parzybok* concerned a traditional condemnation proceeding where the condemnation award exceeded the purchase price indicated in the option. Contained in a lease covenant, the option was not exercisable until 7 years after the lease began. Condemnation took place, however, in year 6, thereby denying the optionee the opportunity to exercise the option. We held that the *Parzybok* optionee could participate in the condemnation award due to the loss of "a contract right, in a definitely measurable amount." *Parzybok,* at 104. Two key facts led to our holding: we believed that, given the opportunity, the optionee would have exercised the option; and the property's fair market value had in fact increased above the option price.

By contrast, PBA does not seek a share of a traditional condemnation award. Rather, it claims standing to bring an inverse condemnation suit to challenge land–use regulations, allegedly so onerous that they deprive the property owner of any reasonably profitable use. Yet under the option terms, PBA has no right to make any use of the subject property until it purchases the property. In *Parzybok,* the condemnation proceeding extinguished the optionee's contract right. A failure to allocate the excess value to the optionee would have worked a permanent harm. Thus far, PBA has lost no contract right; the options remain exercisable.[6] Even if a complete taking has occurred, PBA has the ability to exercise its options, purchase the property, and sell it to the State for just compensation.[7]

In *Parzybok,* we recognized that not every option to purchase was necessarily sufficient to participate in a condemnation award. *Parzybok,* at 104. Under the facts of this case, we agree with the trial court. PBA's purchase options are not a sufficiently strong property interest to support its regulatory takings claim.

## E
### MOTION TO STRIKE

One final procedural matter remains. After remand in *Orion* I, the County filed the affidavit of Richard L. Settle, a professor of law at the University of Puget Sound, who testified as an expert witness on land use. Clerk's Papers, at

---

[6]Although PBA has paid the $6,000 a year option price since 1971, it has done so in order to maintain its rights to purchase the property. PBA specifically recognizes that its options remain exclusive, assignable and enforceable against the optionor's successors.

[7]We doubt whether PBA would have to go to such lengths. While the State has acquired the underlying fee and included the property in the Sanctuary, the State explicitly recognizes that it holds the property subject to PBA's option to purchase. Thus, if a taking has occurred and the State chooses to purchase Orion's property for the Sanctuary, it would undoubtedly decide to save time and money by simply paying PBA the amount by which the condemnation award exceeded the option's $100 per acre purchase price.

1568. Orion moved to strike the Settle affidavit, arguing that it "did not set forth the facts admissible in evidence, but rather consists of legal conclusions, legal argument, and speculation." Clerk's Papers, at 1599. After reviewing the affidavit, the trial court exercised its discretion, admitted the affidavit for a limited purpose, and denied the motion to strike. We affirm.

Essentially, this issue rehashes a similar dispute resolved in *Orion* I. There, the State and County objected to an expert opinion affidavit by Peter C. Buck on the same grounds relied on here by Orion. *Orion* I, at 461. We characterized the issue as a close question, gave deference to the trial court's decision to admit, but required the court to consider only factual information and to disregard any legal conclusions in the affidavit. *Orion* I, at 461–62. Here, in admitting the affidavit, the trial court disregarded the legal conclusions and looked merely to the historical perspective the affidavit provided on the regulatory scheme and on prior development of the tidelands. Given our decision in *Orion* I on the Buck affidavit, and the factual nature of the information the judge obtained from the affidavit, we hold that the trial court properly exercised its discretion in admitting the affidavit for a limited purpose.

## II
### Public Trust Doctrine

In denying State and County motions to dismiss, the trial court held that prior to the SMA's enactment in 1971, a public trust doctrine existed in Washington. Because not all uses of Padilla Bay tidelands would impair the trust, the trial court held further that the public trust doctrine reduced Orion's alleged damages, but did not entirely preclude the takings claim. Clerk's Papers, at 2038. On appeal, the State and County challenge the trial court's conclusion on the scope of the doctrine's operation. Orion argues that no public trust exists in Washington, but if such a trust exists, it does not apply to second class tidelands.

Given our recent decision in *Caminiti v. Boyle,* 107

Wn.2d 662, 732 P.2d 989 (1987), Orion's argument is no longer tenable. In *Caminiti,* we held that a public trust doctrine has always existed in Washington. *Caminiti,* at 669–70. We recognized that state ownership of property has two aspects, the private property interest, which reflects the State's title to the property, and the public authority interest, which reflects the State's sovereignty and dominion. *Caminiti,* at 666–67. The public trust doctrine emanates from this public authority interest, which requires the state to maintain its dominion in trust for the people. *Caminiti,* at 667. Because title in and sovereignty over Washington's tidelands and shorelands vested in the state upon admission into the Union, the public trust doctrine applies to Orion's Padilla Bay tidelands. *See Caminiti,* at 666.

In arguing that no public trust has ever applied to second class tidelands, Orion points to the Legislature's decision to convey large tracts of second class tidelands to private parties. According to Orion, this court expressly approved the diking and filling of 10,000 acres of Padilla Bay tidelands. *See Jones v. Hammer,* 143 Wash. 525, 255 P. 955 (1927). In *Jones,* however, the parties did not raise a public trust challenge to diking and filling. Rather, the action merely required this court to rule whether the general diking statute included second class tidelands. *Jones,* at 530. We acknowledge that during the early part of the 20th century, state policy included the widespread sale of tideland property and the encouragement of diking and filling.[8] Nevertheless, while the State has authority to convey title to these properties, "[t]he Legislature has never had the authority . . . to sell or otherwise abdicate state sovereignty or dominion over such tidelands and shorelands." *Caminiti,* at 666; *see also Long Sault Dev. Co. v. Call,* 242 U.S. 272, 279, 61 L. Ed. 294, 37 S. Ct. 79 (1916) (the public trust devolved to the states upon gaining statehood and is a trust that the state legislature "[cannot] relinquish by a

---

[8]In *Caminiti,* we recognized that prior to 1971 the State had sold 60 percent of its tidelands and 30 percent of its shorelands. *Caminiti,* at 666.

transfer of the property"). The public trust in tidelands and shorelands developed out of the public's need for access to navigable waters. We have repeatedly stated that the sale of second class tidelands, like other trust property, is subject to the paramount public right of navigation and fishery. *Caminiti,* at 667.

Thus, the trial court correctly concluded that prior to the adoption of the SMA, Orion's property was burdened by the public trust doctrine. At issue in *Caminiti,* however, was whether the state violated its public trust duties by granting a revocable license to build recreational docks in state owned tidelands and shorelands. RCW 79.90.105; *Caminiti,* at 666. Here, the facts raise the question of what restrictions the public trust places on Orion, a private party that purchased property subject to the terms of the trust.[9]

The public trust doctrine resembles "a covenant running with the land (or lake or marsh or shore) for the benefit of the public and the land's dependent wildlife." Reed, *The Public Trust Doctrine: Is It Amphibious?,* 1 J. Envtl. L. & Litigation 107, 118 (1986). As a result, at the time it purchased its tidelands, Orion could make no use of the tidelands which would substantially impair the trust. Historically, the trust developed out of the public's need for access to navigable waters and shorelands, and thus the trust encompassed the right of navigation and fishery. *Caminiti,* at 669. The trust's relationship to navigable waters and shorelands resulted not from a limitation, but

---

[9]We do not mean to suggest that once the state conveys to a private party property subject to the trust the property will always be burdened by the trust requirements. For example, the California Supreme Court has held that although the trust originally applied to all tidelands in the San Francisco Bay, properties already dredged and filled under earlier grants were no longer subject to the trust. *Berkeley v. Superior Court,* 26 Cal. 3d 515, 606 P.2d 362, 162 Cal. Rptr. 327, *cert. denied, Santa Fe Land Imp. Co. v. Berkeley,* 449 U.S. 840, 66 L. Ed. 2d 48, 101 S. Ct. 119 (1980). In reaching its decision, the California court stated that "the principle we apply is that the interests of the public are paramount in property that is still physically adaptable for trust uses, whereas the interests of the grantees and their successors should prevail insofar as the tidelands have been rendered substantially valueless for those purposes." *Berkeley,* 26 Cal. 3d at 534.

rather from a recognition of where the public need lay. Reed, 1 J. Envtl. L. & Litigation, at 111. Recognizing modern science's ability to identify the public need, state courts have extended the doctrine beyond its navigational aspects.[10] We have had occasion to extend the doctrine beyond navigational and commercial fishing rights to include "incidental rights of fishing, boating, swimming, water skiing, and other related recreational purposes . . ." *Wilbour v. Gallagher*, 77 Wn.2d 306, 316, 462 P.2d 232, 40 A.L.R.3d 760 (1969), *cert. denied*, 400 U.S. 878, 27 L. Ed. 2d 115, 91 S. Ct. 119 (1970).[11] Resolution of this case does not require us to decide the total scope of the doctrine.

In an unchallenged finding, the trial court held that for the purposes of public recreational navigation, Padilla Bay is navigable. Clerk's Papers, at 2038. Therefore, Orion had no right to make any use of its property that would substantially impair the public rights of navigation and fishing, as well as incidental rights and purposes recognized previously by this court. *See Portage Bay–Roanoke Park Comm'ty Coun. v. Shorelines Hearings Bd.*, 92 Wn.2d 1, 4, 593 P.2d 151 (1979); *Wilbour*, at 316. Orion never had the right to dredge and fill its tidelands, either for a residential community or farmlands. Since a "property right must exist

---

[10]*See, e.g., In re Steuart Transp. Co.*, 495 F. Supp. 38 (E.D. Va. 1980) (under trust doctrine state can claim damages for killing of waterfowl by oil spill); *Just v. Marinette Cy.*, 56 Wis. 2d 7, 201 N.W.2d 761 (1972) (doctrine applies to shorelands totally above water); *Marks v. Whitney*, 6 Cal. 3d 251, 491 P.2d 374, 98 Cal. Rptr. 790 (1971) (public trust protects ecological values and right to preserve tidelands in natural state). *See generally* Wilkinson, *The Public Trust Doctrine in Public Land Law*, 14 U.C.D. L. Rev. 269 (1980) (the doctrine has gone beyond its original water based scope and now applies to public lands that have special importance for health, welfare, and safety of the public).

[11]We have also observed that trust principles are reflected in the SMA's underlying policy, which contemplates "protecting against adverse effects to the public health, the land and its vegetation and wildlife, and the waters of the state and their aquatic life, while protecting generally public rights of navigation and corollary rights incidental thereto." *Portage Bay–Roanoke Park Comm'ty Coun. v. Shorelines Hearings Bd.*, 92 Wn.2d 1, 4, 593 P.2d 151 (1979) (quoting RCW 90.58.020).

before it can be taken," Crooks, *The Washington Shoreline Management Act of 1971,* 49 Wash. L. Rev. 423, 456 (1974), neither the SMA nor the SCSMMP effected a taking by prohibiting Orion's dredge and fill project.

The State argues further that the public trust doctrine precludes Orion's takings claim in its entirety. The validity of the State's argument depends upon whether Orion's property, burdened by the trust, is functionally and economically adaptable to some present, possible, and reasonably profitable use. *Carlson v. Bellevue,* 73 Wn.2d 41, 50–51, 435 P.2d 957 (1968). Although the trial court concluded that not all uses of Orion's tidelands would substantially impair public trust rights, it did not identify any specific uses. As we explain later in this opinion, based on the record below, we cannot determine whether Orion's property is adaptable to any use that does not impair the trust. As a result we have remanded for a further factual determination.

## III
### REGULATORY TAKINGS

Claims of inverse condemnation by excessive regulation have generated controversy around the country.[12] In the instant case, amici curiae briefs have been filed on behalf of a variety of associations and governmental entities.[13] The State, County, and the amici contend that resolution of the instant dispute could have a devastating impact on legislative attempts to address Washington's most difficult and

---

[12]*See, e.g.,* Franck & Pribyl, *Recent Developments in Condemnation Law,* 18 Urb. Law. 877 (1986); Sallet, *Regulatory "Takings" and Just Compensation: The Supreme Court's Search for a Solution Continues,* 18 Urb. Law. 635 (1986); Rose, *Mahon Reconstructed: Why the Takings Issue Is Still a Muddle,* 57 Calif. L. Rev. 561 (1984); Stoebuck, *San Diego Gas: Problems, Pitfalls and a Better Way,* 25 J. Urb. & Contemp. L. 3 (1983); Oakes, *"Property Rights" in Constitutional Analysis Today,* 56 Wash. L. Rev. 583 (1981).

[13]The following submitted amici curiae briefs: the City of Seattle and the Association of Washington Cities, the Washington Environmental Council, the Washington State Association of Counties and the Washington Association of Prosecuting Attorneys, and King County.

environmentally sensitive land–use problems. Nevertheless, we must also keep in mind the need to protect property owners' constitutional rights to due process and to just compensation whenever their property is "taken" for public use. Moreover, subsequent to briefing and oral argument, the Supreme Court issued three decisions addressing various aspects of the regulatory takings controversy. *Nollan v. California Coastal Comm'n,* __ U.S. __, 97 L. Ed. 2d 677, 107 S. Ct. 3141 (1987); *First English Evangelical Lutheran Church v. County of Los Angeles,* __ U.S. __, 96 L. Ed. 2d 250, 107 S. Ct. 2378 (1987); *Keystone Bituminous Coal Ass'n v. DeBenedictis,* __ U.S. __, 94 L. Ed. 2d 472, 107 S. Ct. 1232 (1987).

## A

Several threshold questions must be resolved before we address the specific regulatory takings issues raised in this appeal. Because Orion alleged a taking by both the State and the County, we must first determine which government bears responsibility for the alleged taking. The trial court denied the County's motion to dismiss it as a party and the County challenges that decision. It argues that no action on its part proximately caused the alleged taking. We agree that the trial court erred in denying the County's motion to dismiss; the State must take full responsibility if a taking has in fact occurred.

In developing the SCSMMP, the County acted under the direction and control of the State. State regulations required the County to give preferences to certain uses. WAC 173–16–040(5). As to estuaries, the regulations suggested that such lands should be left in their natural state. WAC 173–16–050(5). No one has alleged that SCSMMP requirements for issuing a conditional use permit differed in any substantial way from the WAC guidelines. Moreover, the SCSMMP became effective only when adopted or approved by the State Department of Ecology. RCW 90.58.090. Upon adoption, the SCSMMP became state regulation. *Harvey v. Board of Cy. Comm'rs,* 90

Wn.2d 473, 584 P.2d 391 (1978); *Friends & Land Owners Opposing Dev. v. Department of Ecology,* 38 Wn. App. 84, 684 P.2d 765 (1984). Because the County acted at the instance of and, in some material degree, under the direction and control of the State, an agency relationship developed between the parties. *See Hewson Constr., Inc. v. Reintree Corp.,* 101 Wn.2d 819, 823, 685 P.2d 1062 (1984). As the principal of an agent acting within its authority, the State must take full responsibility if a taking occurred. *See, e.g., Tyler v. Grange Ins. Ass'n,* 3 Wn. App. 167, 473 P.2d 193 (1970). Consequently, we reverse the trial court and dismiss the County from this action.

The State contends, however, that the Department of Ecology is insulated from Orion's inverse condemnation claim because Ecology does not have the power of eminent domain under the SMA. RCW 90.58.240(1); *see* Crooks, *The Washington Shoreline Management Act of 1971,* 49 Wash. L. Rev. 423, 457 (1974). The State bases its no–power–to–condemn argument on our definition of inverse condemnation as "an action brought against a governmental entity having the power of eminent domain to recover the value of property which has been appropriated in fact, but with no formal exercise of the power." *Highline Sch. Dist. 401 v. Port of Seattle,* 87 Wn.2d 6, 8 n.1, 548 P.2d 1085 (1976). Because Ecology has no power of eminent domain, the State argues that *Highline* precludes Orion's action.

■ We find the State's argument unpersuasive and without merit. Rather, we follow the well reasoned approach employed by the Eleventh Circuit to reject a similar contention. "As long as the state acts through one of its arms in such a way as to deprive an individual of his property for public use, it is irrelevant whether the state arm doing the actual taking has eminent domain power." *Fountain v. Metropolitan Atlanta Rapid Transit Auth.,* 678 F.2d 1038, 1043–44 (11th Cir. 1982).

## B

The State contends the trial court erred in concluding that application of the regulatory regime to Orion's property resulted in a taking violative of both the United States Constitution and the Washington Declaration of Rights. Landowners have a right, under article 1, section 16 of the Washington Constitution,[14] as well as under the fifth and fourteenth amendments to the United States Constitution,[15] to challenge the constitutionality of land use regulations in an inverse condemnation action. *First English Evangelical Lutheran Church,* 107 S. Ct. at 2382–83; *Buttnick v. Seattle,* 105 Wn.2d 857, 719 P.2d 93 (1986). Police power actions limiting the use of private property can constitute a de facto exercise of eminent domain requiring just compensation. *See, e.g., Keystone Bituminous Coal Ass'n v. DeBenedictis, supra; Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 413–14, 67 L. Ed. 322, 43 S. Ct. 158 (1922); *Buttnick v. Seattle, supra; Maple Leaf Investors, Inc. v. Department of Ecology,* 88 Wn.2d 726, 732, 565 P.2d 1162 (1977). Yet, articulating a doctrinally consistent, definitive test has proved an elusive goal, sometimes characterized as "the 'lawyer's equivalent of the physicist's hunt for the quark.'" *See, e.g., Williamson Cy. Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 199 n.17, 87 L. Ed. 2d 126, 105 S. Ct. 3108 (1985).

The inability to develop a definitive police power "takings" doctrine has been linked to two doctrinal inconsistencies. First, commentators point to unresolved tensions between divergent lines of authority. *See, e.g.,* Stoebuck, *San Diego Gas: Problems, Pitfalls and a Better Way,* 25 J.

---

[14]In its relevant part, Const. art. 1, § 16 provides that "[n]o private property shall be taken or damaged for public or private use without just compensation having been first made . . ."

[15]The fifth amendment to the United States Constitution provides "nor shall private property be taken for public use, without just compensation", and was first applied to the states in *Chicago, B. & O. R.R. v. Chicago,* 166 U.S. 226, 41 L. Ed. 979, 17 S. Ct. 581 (1897).

Urb. & Contemp. L. 3, 20 (1983); Oakes, *"Property Rights" in Constitutional Analysis Today,* 56 Wash. L. Rev. 583, 586–87 (1981). On the one hand, federal and state case law hold an exercise of the police power protective of the public health, safety, or welfare cannot be a taking requiring compensation. *See, e.g., Keystone Bituminous Coal Ass'n v. DeBenedictis, supra; Miller v. Schoene,* 276 U.S. 272, 72 L. Ed. 568, 48 S. Ct. 246 (1928); *Mugler v. Kansas,* 123 U.S. 623, 31 L. Ed. 205, 8 S. Ct. 273 (1897); *Cougar Business Owners Ass'n v. State,* 97 Wn.2d 466, 647 P.2d 481 (1982), *cert. denied,* 459 U.S. 971 (1983); *Markham Advertising Co. v. State,* 73 Wn.2d 405, 427, 439 P.2d 248 (1968), *appeal dismissed,* 393 U.S. 316, 21 L. Ed. 2d 512, 89 S. Ct. 553 (1969).[16] On the other hand, regulatory takings jurisprudence holds that even a valid exercise of the police power limiting the use of private property can go "too far" and be a "taking". *See, e.g., Hamilton Bank,* at 185; *Pennsylvania Coal,* 260 U.S. at 413–14; *Granat v. Keasler,* 99 Wn.2d 564, 569–70, 663 P.2d 830, *cert. denied,* 464 U.S. 1018 (1983); *Maple Leaf Investors,* at 731.

In addition to the conflicting authority, commentators have also pointed out that the regulatory takings doctrine and the long–standing substantive due process test seem analytically identical. *See, e.g.,* Stoebuck, 25 J. Urb. & Contemp. L. at 20; Comment, *Testing the Constitutional Validity of Land Use Regulations: Substantive Due Process as a Superior Alternative to Takings Analysis,* 57 Wash. L. Rev. 715, 729 (1982). Under the classic, 3–pronged, substantive due process test of reasonableness, a

---

[16]For example, in *Mugler,* the Supreme Court held that no taking occurred when Kansas prohibited the manufacture and sale of intoxicating liquor, thereby destroying most of the value of a brewery built when it was legal to do so. *Mugler v. Kansas,* 123 U.S. 623, 657, 31 L. Ed. 205, 8 S. Ct. 273 (1897). In *Cougar Business Owners Ass'n,* we rejected a takings challenge to an emergency regulation intended to protect the public. We held that inclusion of the town of Cougar in a restricted zone created around Mt. St. Helens constituted a valid exercise of the State's police power, despite the temporary, near total economic deprivation suffered. *Cougar Business Owners Ass'n v. State,* 97 Wn.2d 466, 476–79, 647 P.2d 481 (1982), *cert. denied,* 459 U.S. 971 (1983).

police power action must be reasonably necessary to serve a legitimate state interest. *Goldblatt v. Hempstead,* 369 U.S. 590, 594–95, 8 L. Ed. 2d 130, 82 S. Ct. 987 (1962); *Lawton v. Steele,* 152 U.S. 133, 137, 38 L. Ed. 385, 14 S. Ct. 499 (1894); *West Main Assocs. v. Bellevue,* 106 Wn.2d 47, 52, 720 P.2d 782 (1986); *Cougar Business Owners Ass'n v. State, supra* at 476. A regulatory taking also hinges on whether the challenged regulation is "reasonably necessary to the effectuation of a substantial public purpose", *Penn Cent. Transp. Co. v. New York,* 438 U.S. 104, 127, 57 L. Ed. 2d 631, 98 S. Ct. 2646 (1978) or "'does not substantially advance legitimate state interests . . .'", *Keystone Coal Ass'n,* 94 L. Ed. 2d at 488 (quoting *Agins v. Tiburon,* 447 U.S. 255, 260, 65 L. Ed. 2d 106, 100 S. Ct. 2138 (1980)).[17] Likewise, little difference seems to exist between the substantive due process requirement that police power actions not be overly oppressive on an individual property owner, *Goldblatt,* 369 U.S. at 594–95; *West Main Assocs.,* 106 Wn.2d at 52, and hinging a taking on whether a regulation has gone "too far", causing the property owner to suffer an economic deprivation significant enough to outweigh the public interest. *Keystone Coal Ass'n,* 94 L. Ed. 2d at 493; *Granat,* at 569–70; *Maple Leaf Investors,* at 734.

Our own case law provides an excellent example of the doctrinal blurring that has occurred between due process and regulatory takings. In some cases we test the validity of

---

[17]Our case law has never referred to the nexus between the public purpose and the regulation as determinative of a regulatory taking. In its most recent decision, the Supreme Court maintains that its "verbal formulations in the takings field have generally been quite different" from the standards applied to due process claims. *Nollan v. California Coastal Comm'n,* ___ U.S. ___, 97 L. Ed. 2d 677, 107 S. Ct. 3141, 3147 n.3 (1987). While the Court admits that its decision in *Goldblatt v. Hempstead,* 369 U.S. 590, 8 L. Ed. 2d 130, 82 S. Ct. 987 (1962) does assume that the inquiries are the same, it characterizes that assumption as inconsistent with the later case requirement "that the regulation 'substantially advance' the 'legitimate state interest' sought to be achieved . . ." *Nollan,* 107 S. Ct. at 3141 n.3. Justice Brennan's analysis of the phraseology used, however, indicates that the slight difference between "substantially advance" and "reasonably necessary" "cannot, however, obscure the fact that the inquiry in each case is the same." *Nollan,* 107 S. Ct. at 3151 n.1 (Brennan, J., dissenting).

land use regulations using the 3–pronged, substantive due process test, *see, e.g., West Main Assocs. v. Bellevue,* 106 Wn.2d 47, 52, 720 P.2d 782 (1986); *Cougar Business Owners Ass'n,* at 476. If the same party alleges a regulatory taking, we follow the Supreme Court, and purport to ignore substantive due process, applying instead the regulatory takings analysis derived from *Pennsylvania Coal. See, e.g., Department of Natural Resources v. Thurston Cy.,* 92 Wn.2d 656, 601 P.2d 494 (1979), *cert. denied,* 449 U.S. 830 (1980); *Maple Leaf Investors, Inc. v. Department of Ecology,* 88 Wn.2d 726, 565 P.2d 1162 (1977). Nevertheless, our regulatory takings doctrine and the 3–pronged substantive due process test seem almost analytically identical—resolution under either approach depends upon the regulation's reasonableness. *Compare West Main Assocs. and Norco Constr., Inc. v. King Cy.,* 97 Wn.2d 680, 685, 649 P.2d 103 (1982) *with Buttnick v. Seattle,* 105 Wn.2d 857, 862, 719 P.2d 93 (1986), *Granat v. Keasler, supra* at 569–70 *and Kennedy v. Seattle,* 94 Wn.2d 376, 386, 617 P.2d 713 (1980). *See also Granat,* at 571–72 (Utter, J., concurring). In fact, in the past 20 years we have found a taking only on two occasions, and in each we implicitly employed a substantive due process analysis and remedy. *See Granat v. Keasler, supra; Kennedy v. Seattle, supra.*[18]

The fact that both the substantive due process test and the regulatory takings doctrine conceptually apply to the problem of excessive regulation should not be surprising. Basically, the primary problem caused by an excessive police power regulation is that it requires the landowner to shoulder an economic burden, which in justice and fairness

---

[18]In *Kennedy,* for example, we characterized our approach as a takings analysis, but invalidated a Seattle houseboat moorage ordinance as *unreasonable.* 94 Wn.2d at 386. Three years later, in *Granat,* we used a due process reasonableness test to find another section of the Seattle houseboat–moorage ordinance unreasonable because the landlord wanted to use the moorage for his houseboat, but the ordinance prevented him from evicting his tenant. Because we found the ordinance unreasonable, it constituted a taking. But the remedy included restitution of the property and statutory costs, not just compensation damages. 99 Wn.2d at 569–70.

the public should rightfully bear. *Kaiser Aetna v. United States,* 444 U.S. 164, 175, 62 L. Ed. 2d 332, 100 S. Ct. 383 (1979). We can protect landowners from the unfair burden by invoking *either* the constitutional guaranty that property will not be deprived without due process of law, U.S. Const. amends. 5, 14; Const. art. 1, § 3, or the constitutional requirement of just compensation whenever the state exercises its power of eminent domain to take private property for public use. U.S. Const. amend. 5; Const. art. 1, § 16. The crucial difference lies in the remedy to be applied: invalidation or the payment of just compensation.

This is, of course, not an insignificant difference. Once we characterize an excessive regulation as a taking, the mandate of article 1, section 16 requires just compensation. Likewise, the Fifth and Fourteenth Amendments require payment for the time that the public had use of the land while the regulation remained effective. *First English Evangelical Lutheran Church,* 107 S. Ct. at 2388. Thus, choosing to invoke the takings analysis instead of the due process test will necessarily trigger the specter of financial liability. If all excessive regulations require just compensation, rather than invalidation, land–use decision makers, who adopt regulations in a good faith attempt to prevent a public harm, will nevertheless be held strictly liable for regulations that result in a taking. Undoubtedly, the specter of strict financial liability will intimidate legislative bodies from making the difficult, but necessary choices presented by the most sensitive environmental land–use problems. *See* Sallet, *Regulatory "Takings" and Just Compensation: The Supreme Court's Search for a Solution Continues,* 18 Urb. Law. 635, 649–50 (1986).

■ Strict liability would not result for all excessive regulations, however, under the approach developed in our own regulatory takings jurisprudence. Our case law has successfully harmonized the *Pennsylvania Coal* "too far" balancing approach with *Mugler's* insulation of police power actions from characterization as a taking. The first step in our regulatory takings analysis requires assessment

of the economic deprivation suffered by the landowner, as part of a case–by–case balancing of the public interest served by the regulation against the private landowners' interests in not being burdened by restrictions on the use of their property. *Granat v. Keasler,* 99 Wn.2d 564, 569, 663 P.2d 830 (1983); *Department of Natural Resources v. Thurston Cy.,* 92 Wn.2d 656, 669, 601 P.2d 494 (1979), *cert. denied,* 449 U.S. 830 (1980); *Maple Leaf Investors,* at 731. Assessment of the economic impact of the regulation reflects the *Pennsylvania Coal* "too far" test.

A significant enough economic impact has never, in and of itself, been sufficient to establish a regulatory taking under Washington law. Occurrence of a compensable taking has always depended upon the purpose and actual effect of the government's interference with the use of the property. *See, e.g., Granat,* at 569; *Department of Natural Resources v. Thurston Cy., supra* at 669; *Maple Leaf Investors,* at 733–34. We have long recognized a conceptual difference between a "taking" by eminent domain, which takes property for public use, and the exercise of the police power, which limits the landowner's use to "conserve the safety, morals, health and general welfare of the public." *Maple Leaf Investors, Inc. v. Department of Ecology,* 88 Wn.2d 726, 732, 565 P.2d 1162 (1977) (quoting *Conger v. Pierce Cy.,* 116 Wash. 27, 35–36, 198 P. 377, 18 A.L.R. 393 (1921)).[19] In so doing, we have reflected the position adopted by the Supreme Court in *Mugler,* where the Court stated that a prohibition on injurious uses must be tested not under principles governing eminent domain, but rather under the due process guaranty. *Mugler,* 123 U.S. at 668–69; *see also* Stoebuck, 25 J. Urb. & Contemp. L. at 12 (characterizing *Mugler* as announcing that "the police

---

[19]Several state courts have distinguished police power actions having a valid purpose and effect from actions that effect a de facto eminent domain taking. *See, e.g., Carter v. South Carolina Coastal Coun.,* 314 S.E.2d 327 (S.C. 1984); *Wyoming Borough v. Wyco Realty Co.,* 64 Pa. Commw. 459, 440 A.2d 696 (1982); *Graham v. Estuary Properties, Inc.,* 399 So. 2d 1374 (Fla.), *cert. denied sub nom. Taylor v. Graham,* 454 U.S. 1083 (1981).

power's being one thing and the eminent domain power's being another, no exercise of police power is an eminent domain 'taking"). Thus, in *Maple Leaf Investors,* as well as subsequent cases, we held that the challenged regulation could not effect an eminent domain taking, unless the nature of the encumbrance imposed by the regulation went beyond preventing harm to actually enhance a publicly owned right in land. *See, e.g., Department of Natural Resources v. Thurston Cy.,* 92 Wn.2d 656, 601 P.2d 494 (1979), *cert. denied,* 449 U.S. 830 (1980); *Rains v. Department of Fisheries,* 89 Wn.2d 740, 575 P.2d 1057 (1978); *Maple Leaf Investors,* at 733–34.

By harmonizing *Pennsylvania Coal* and *Mugler,* our case law implicitly recognized a dividing line between land–use regulations that deprive property rights without due process and land–use regulations that go one step further to effect a compensable taking. The extent of the economic deprivation served as no more than a metaphor for determining the regulation's validity under substantive due process, that is, whether the regulation is unreasonably oppressive on an individual property owner. *See Fred F. French Investing Co. v. New York,* 39 N.Y.2d 587, 350 N.E.2d 381, 385 N.Y.S.2d 5 (1976) (concluding that the *Pennsylvania Coal* "too far" test was merely a "metaphor" for a due process violation). If the landowner has suffered a significant enough economic deprivation, the land–use regulation would be overly oppressive, and thus an invalid exercise of the police power. Just compensation would be required only if during the time the regulation remained in effect, it went beyond seeking to safeguard the public from harm to accomplish a de facto exercise of the eminent domain power.

By clearly delineating when an excessive regulation violates substantive due process, as opposed to accomplishing a de facto eminent domain taking, we can best protect the property owner from shouldering the cost of a burden the public should bear, without unnecessarily creating the specter of unanticipated financial damages for all excessive

regulations. Thus, our approach enables us to meet our most important consideration of reconciling "property rights and social needs." *See Department of Ecology v. Pacesetter Constr. Co.*, 89 Wn.2d 203, 210, 571 P.2d 196 (1977).[20]

## C

It is well recognized, however, that the federal constitution sets a minimum floor of protection below which state law may not go. *See, e.g., Michigan v. Long*, 463 U.S. 1032, 77 L. Ed. 2d 1201, 103 S. Ct. 3469 (1983). We have often had occasion to determine whether our state constitution provides broader civil liberty protection than the minimum requirements set by the federal constitution. *See, e.g., State v. Stroud*, 106 Wn.2d 144, 720 P.2d 436 (1986); *State v. Bartholomew*, 101 Wn.2d 631, 683 P.2d 1079 (1984). If our state constitution provides the protection sought, a federal question under the Fourteenth Amendment's due process clause does not arise. *State v. Coe*, 101 Wn.2d 364, 374, 679 P.2d 353 (1984); *accord, Massachusetts v. Upton*, 466 U.S. 727, 730–31, 80 L. Ed. 2d 721, 104 S. Ct. 2085 (1984) (per curiam) (Stevens, J., concurring); Linde, *E Pluribus—Constitutional Theory and State Courts*, 18 Ga. L. Rev. 165, 178 (1984). Due to recent events, however, we must ensure that our state approach conforms with the minimum due process floor set by the fifth amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment. *See First English Evangelical Lutheran Church v. County of Los Angeles*,

---

[20]In *Pacesetter Constr.*, we rejected a challenge to the balancing approach based on the distinction between the police power and the eminent domain power. *See Department of Ecology v. Pacesetter Constr. Co.*, 89 Wn.2d 203, 210, 571 P.2d 196 (1977). There, the challenger argued that an exercise of the police power could never trigger the just compensation requirement. We concluded, however, that a mere verbal distinction did not reconcile property rights and social needs. *Pacesetter Constr.*, at 210. By recognizing the distinction between a police power limitation, the validity of which continues to depend on the balancing test, and a de facto eminent domain taking, we can better reconcile those competing interests.

___ U.S. ___, 96 L. Ed. 2d 250, 107 S. Ct. 2378 (1987) (invalidating as violative of the Fifth and Fourteenth Amendments the California rule limiting the remedy for a regulatory taking to invalidation).

In its recent trio of takings decisions, the Supreme Court attempted to settle various aspects of the controversy surrounding the federal regulatory takings doctrine. *See Nollan v. California Coastal Comm'n,* ___ U.S. ___, 97 L. Ed. 2d 677, 107 S. Ct. 3141 (1987); *First English Evangelical Lutheran Church v. County of Los Angeles,* ___ U.S. ___, 96 L. Ed. 2d 250, 107 S. Ct. 2378 (1987); *Keystone Bituminous Coal Ass'n v. DeBenedictis,* ___ U.S. ___, 94 L. Ed. 2d 472, 107 S. Ct. 1232 (1987). Despite these attempts, the definitive answers, so necessary for state courts to make reasoned determinations concerning minimum federal due process requirements, remain unavailable. Our task is complicated further by the ambiguities contained in recent Supreme Court decisions and by the fact that despite a 3-month separation, recent cases do not cite each other.[21] As Justice Stevens observed, "[e]ven the wisest lawyers would have to acknowledge great uncertainty about the scope of [federal regulatory] takings jurisprudence." *Nollan,* 107 S. Ct. at 3163 (Stevens, J., dissenting).

■ At minimum, we can conclude that the federal regulatory takings doctrine precludes us from expressly hinging occurrence of a taking on whether the invalidated regulation actually provided the public with some use of the land. Federal takings jurisprudence seems founded on the concept that a denial of all use resulting in a significant enough economic deprivation in and of itself amounts to a compensable taking. *First English Evangelical Lutheran*

---

[21]For example, in March 1987, the majority opinion in *Keystone Coal Ass'n,* written by Justice Stevens, went to great length to explain the federal takings doctrine's various elements. *Keystone Coal Ass'n,* 94 L. Ed. 2d at 485-99. Yet in June, the majority opinions in *First English Evangelical Lutheran Church* and *Nollan,* written respectively by Chief Justice Rehnquist and Justice Scalia, both of whom dissented in *Keystone Coal Ass'n,* never acknowledged the existence of the *Keystone* decision.

*Church,* 107 S. Ct. at 2386–88. For the purposes of whether a compensable taking has occurred, the Supreme Court does not explicitly recognize a distinction between a police power deprivation of all use, invalid as a substantive due process violation, and a regulation that actually takes property for public use, which would require compensation. In addition, the Court in *Nollan* rejected the contention that the standards for a takings challenge and a due process challenge are identical. *Nollan,* 107 S. Ct. at 3147 n.3.

These differences, however, seem more linguistic than substantive.[22] Similar to our state analysis, federal law affords some special protection to regulations of the type at issue in *Mugler*—police power actions seeking to safeguard public health and safety. *See Keystone Coal Ass'n,* 94 L. Ed. 2d at 489–92. As we read the *Keystone Coal Ass'n* opinion, exercises of the police power cannot be characterized as a compensable taking whenever the state imposes land use restrictions in order to safeguard the "*public interest in health, the environment, and the fiscal integrity of the area.*" (Italics ours.) *Keystone Coal Ass'n,* 94 L. Ed. 2d at 490. This insulation from the takings analysis continues, even if the regulation denies a landowner all economically viable use of the property. *First English Evangelical Lutheran Church,* 107 S. Ct. at 2384–85.[23] We assume, however, that because the police power has its limits, even

---

[22]For example, the result reached in *Nollan* would have been the same under the 2–step due process/eminent domain approach. Yet, the result in *Nollan* makes more doctrinal sense using the 2–step approach. The *Nollan* Court found that requiring the property owner to grant an easement did not serve the purposes offered by the Coastal Commission to support the requirement. 107 S. Ct. at 3148–49. The Court could have invoked due process, invalidated the requirement as unreasonable, and then looked to see if, while effective, the easement requirement constituted a taking. Because an easement provides the public with actual use of the subject property, a compensable taking had obviously occurred.

[23]In *First English Evangelical Lutheran Church,* Chief Justice Rehnquist's majority opinion identified "safety regulations" as insulated from characterization as a taking. 107 S. Ct. at 2384–85. A review of Supreme Court jurisprudence demonstrates that "safety regulations" include exercises of the police power intended to safeguard the following: (1) public health, *see Mugler v. Kansas,* 123

insulated regulations must withstand the due process test of reasonableness. *See Goldblatt,* 369 U.S. at 594–96; *Mugler,* 123 U.S. at 657.[24]

Where a regulation does not enjoy insulation from the takings claim, a regulatory taking can result if the regulation does not "'substantially [advance] legitimate state interests'" *Nollan,* 107 S. Ct. at 3146 (quoting *Agins v. Tiburon,* 447 U.S. 255, 260, 65 L. Ed. 2d 106, 100 S. Ct. 2138 (1980)) or if the property owner suffers an economic deprivation significant enough to outweigh the public interest served by the regulation. *Keystone Coal Ass'n,* 94 L. Ed. 2d at 492–93; *accord, Maple Leaf Investors,* at 733. If land–use regulations do not substantially advance a legitimate purpose, the lack of nexus between the regulation and the purpose sought to be served "converts that purpose to something other than what it was." *Nollan,* 107 S. Ct. at 3148.[25]

---

U.S. 623, 31 L. Ed. 205, 8 S. Ct. 273 (1897) (prohibition of the sale and manufacture of intoxicants); (2) the public interest in the environment, *see Goldblatt v. Hempstead,* 369 U.S. 590, 8 L. Ed. 2d 130, 82 S. Ct. 987 (1962) (prohibition against open pit excavations beyond certain depth to protect the water table); and (3) fiscal integrity of the community, *see Miller v. Schoene,* 276 U.S. 272, 72 L. Ed. 568, 48 S. Ct. 246 (1928) (no taking occurred when Virginia required cedar tree owners to cut down trees to prevent disease from destroying apple orchards, one of the key commercial industries in the state).

[24]We also assume that whether the regulation is overly oppressive on the individual property owner depends on such factors as the nature of the harm sought to be avoided, the availability and effectiveness of less drastic protective measures, and the economic loss suffered by the property owner. *Goldblatt v. Hempstead,* 369 U.S. 590, 594–95, 8 L. Ed. 2d 130, 82 S. Ct. 987 (1962).

[25]In *Nollan,* the Court did not explain why the lack of the necessary nexus should constitute a taking in and of itself. The Court found that hinging a building permit on the public receiving an easement did not serve any valid purpose for regulating the land. *Nollan,* 107 S. Ct. at 3150. But the occurrence of the taking hinged on the nature of the encumbrance placed on the property owner, much like the second step in our due process/eminent domain approach. Absent the necessary nexus, the easement requirement amounted to the taking of a property right for public use without compensation, and thus was a taking. *Nollan,* 107 S. Ct. at 3151–53. If, for example, the lack of the necessary nexus resulted in a simple prohibition of some use, rather than an easement, would a taking still have occurred?

If the regulation substantially advances the legitimate public purpose, the court looks to the significance of the economic deprivation, with the property owner's standard of proof varying according to the nature of the claim. In a facial challenge, the property owner must show that the challenged regulation denied all economically viable use of his or her property. *Keystone Coal Ass'n,* 94 L. Ed. 2d at 494–95. When the takings challenge concerns the application of the regulatory regime to a specific piece of property, as in Orion's case, the court looks to the challenged regulation's economic impact and the extent of its interference with reasonable, investment–backed expectations. *Keystone Coal Ass'n,* 94 L. Ed. 2d at 494–95.

When a regulatory taking occurs, the proper remedy under either article 1, section 16 or the Fifth Amendment would be just compensation. In *First English Evangelical Lutheran Church,* the Court rejected the California regulatory takings doctrine, under which claimants could seek invalidation, but not compensation damages. The Court reasoned that once a regulatory taking has in fact occurred, invalidation "is not a sufficient remedy to meet the demands of the Just Compensation Clause." *First English Evangelical Lutheran Church,* 107 S. Ct. at 2388. In requiring just compensation for regulatory takings, the Court recognized that its ruling "will undoubtedly lessen to some extent the freedom and flexibility of land–use planners and governing bodies of municipal corporations when enacting land–use regulations." *First English Evangelical Lutheran Church,* 107 S. Ct. at 2389. Had the Court expressly adopted a 2–step due process/eminent domain approach it could have provided land–use decision makers a clear signal as to when compensation would be required. The 2–step approach puts decision makers on notice that compensation would attach if the regulation went beyond preventing harm, to enhance a publicly owned right in land. This clear signal would lessen the intimidation of legislative bodies that the California Supreme Court believed would result from attaching strict financial liability to all regula-

tions adopted in good faith, but subsequently determined to have effected a compensable taking. *See Agins v. Tiburon,* 24 Cal. 3d 266, 276, 598 P.2d 25, 157 Cal. Rptr. 372 (1979).[26]

Even under the Supreme Court's approach, however, land–use decision makers have a guidepost, albeit a vague one, by which to gauge their actions. No compensable taking can occur as long as regulations substantially serve the legitimate public purpose of prohibiting uses of property injurious to the *public* interest in health, the environment, or the fiscal integrity of the community. At most, such regulations would be subject to invalidation as an unreasonable burden, violative of substantive due process.

Certain aspects of our state regulatory takings doctrine appear to conflict with federal analysis. We believe whatever differences exist result from our willingness to expressly recognize the role of substantive due process. Under either analytical approach, regulations aimed at preventing injury to the public interest are subject to a substantive due process claim, rather than a regulatory takings challenge. Thus, the breadth of constitutional protection under the state and federal just compensation clauses remains virtually identical. Nevertheless, in order to avoid exacerbating the confusion surrounding the regulatory takings doctrine, and because the federal approach may in

[26]Our due process/eminent domain approach differs substantially from the California approach invalidated in *First English Evangelical Lutheran Church.* California had limited the remedy for a regulatory taking to invalidation, rather than just compensation. Under our approach, when a regulation invalidated as a substantive due process violation effects a taking for public use, just compensation must be paid. Justice Brennan feared that the California mere invalidation approach would allow overzealous officials the opportunity to pass subsequent unconstitutional regulations, subjecting the property owner to continued harassment and legal costs. *San Diego Gas & Elec. Co. v. San Diego,* 450 U.S. 621, 655 n.22, 67 L. Ed. 2d 551, 101 S. Ct. 1287 (1981) (Brennan, J., dissenting). Because of the protection afforded in RCW 64.40, we need not worry about potential harassment problems. The Legislature provided landowners with a cause of action whenever governmental land–use decision makers act arbitrarily, capriciously, recklessly, or with knowledge that their action was unlawful or exceeded authority. RCW 64.40.020.

some instance provide broader protection, we will apply the federal analysis to review all regulatory takings claims, including Orion's.

### D

Orion has the heavy burden of overcoming the presumption of constitutionality accorded to government land–use regulations. *Granat v. Keasler,* 99 Wn.2d 564, 568, 663 P.2d 830, *cert. denied,* 464 U.S. 1018 (1983); *accord, Keystone Coal Ass'n,* 94 L. Ed. 2d at 493 ("heavy burden placed upon one alleging a regulatory taking"). Because of the unusual circumstances in this case, we have held that Orion's takings claim is ripe for review, despite the lack of a final decision by the local regulatory decision maker concerning uses allowed on Orion's property. *See Williamson Cy. Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 194, 87 L. Ed. 2d 126, 105 S. Ct. 3108 (1985).

We can uphold the trial court's summary judgment in Orion's favor only if we conclude that no genuine issues of material fact exist concerning the three components of a regulatory takings claim: (1) whether the regulatory regime as applied to Orion's property scheme was insulated from a takings challenge as part of the State's authority to enact health and safety regulations, *see Keystone Bituminous Coal Ass'n v. DeBenedictis,* __ U.S. __, 94 L. Ed. 2d 472, 491–93, 107 S. Ct. 1232 (1987); *Maple Leaf Investors, Inc. v. Department of Ecology,* 88 Wn.2d 726, 733, 565 P.2d 1162 (1977); (2) whether a compensable taking occurred because the challenged regulations did not substantially advance a legitimate public purpose or because they caused a sufficiently significant economic deprivation, *see Keystone Coal Ass'n,* 94 L. Ed. 2d at 492; *Maple Leaf Investors,* at 731–32; and (3) whether the taking violated the constitution because any compensation offered by the State was not "just." Const. art. 1, § 16; *see MacDonald, Sommer & Frates v. Yolo Cy.,* 477 U.S. 340, 91 L. Ed. 2d 285, 294, 106 S. Ct. 2561 (1986). Because we find that a variety of material factual issues remain unresolved as to all three

components, we hold that summary judgment on the regulatory takings claim was improper. *Wilson v. Steinbach,* 98 Wn.2d 434, 656 P.2d 1030 (1982).

 1. Does the State merit insulation from a takings challenge?

■ Whether application of the regulatory regime to Orion's property merited insulation from a takings challenge was not expressly litigated at trial. This determination depends upon whether the public trust doctrine, the original enactment of the SMA and the SCSMMP, or the creation of the Sanctuary proximately caused Orion's inability to make a profitable use of its land. *See Alger v. Mukilteo,* 107 Wn.2d 541, 730 P.2d 1333 (1987) (absent proximate cause there can be no taking). Although we have held that Orion could not obtain a permit to make any profitable use of its land, Orion still must demonstrate that its tideland property was reasonably adaptable, both economically and functionally, to some present, legally permissible, reasonably profitable use prior to enactment of the SMA and the SCSMMP. *Department of Natural Resources v. Thurston Cy.,* 92 Wn.2d 656, 669, 601 P.2d 494 (1979), *cert. denied,* 449 U.S. 830 (1980); *Carlson v. Bellevue,* 73 Wn.2d 41, 51, 435 P.2d 957 (1968). Identifying the existing, reasonably profitable uses will determine the proximate cause of Orion's problem. Unless the trial court finds that the Sanctuary's creation proximately caused the alleged taking, the application of the SMA and SCSMMP to Orion's property merits insulation from characterization as a taking.

 Orion purchased its property subject to the limitations imposed by the public trust doctrine. See section II, *supra.* Because of the trust's requirements, Orion's plans for a residential community or farmland, both of which required dredging and filling, never constituted a legally permissible use. Nor are the tidelands functionally adaptable to such uses. *See, e.g., State Wetlands Bd. v. Marshall,* 127 N.H. 240, 247, 500 A.2d 685, 689 (1985); *Just v. Marinette Cy.,*

56 Wis. 2d 7, 17, 201 N.W.2d 761, 768 (1972). The trial court found that not all uses of Padilla Bay tidelands would substantially impair public navigational rights. Unfortunately, the court did not identify these consistent uses, nor did the court enter a finding as to which of these uses, if any, could have been reasonably profitable on Orion's property. As we explained in our discussion of the public trust, see section II, *supra,* if the court determines on remand that Orion could make no reasonably profitable use of its land consistent with the public trust, no taking occurred.

If profitable uses did exist, the court must determine if the SMA and SCSMMP proximately caused the denial of use. The original enactment of the SMA and the SCSMMP left Orion with several possible uses: recreation, education, research, and aquaculture. Previously we concluded that only aquaculture constituted a reasonably profitable use of Orion's property. *Orion Corp. v. State,* 103 Wn.2d 441, 458, 693 P.2d 1369 (1985). Although the record contains persuasive evidence that Orion's property was suitable to use for aquaculture as a profitmaking venture, Orion disputes this conclusion with evidence sufficient enough to create an issue of material fact. This court's function does not include resolving existing factual issues. *Dickinson v. Edwards,* 105 Wn.2d 457, 461, 716 P.2d 814 (1986). Thus, whether part of Orion's property was suitable for a commercial aquaculture venture, or to some other legally permissible, economically and functionally adaptable use, must be resolved on remand.

If aquaculture was not an economically viable use, and some other reasonably profitable use existed, then the original enactment of the SMA and the SCSMMP proximately caused Orion's difficulties. However, the SMA and SCSMMP qualified as a public health and safety regulation, insulated from characterization as a taking, and thus subject to challenge only under substantive due process. As we have recognized previously, the SMA established a regulatory scheme to serve several purposes: (1) to safeguard

the environment, *Department of Ecology v. Pacesetter Constr. Co.,* 89 Wn.2d 203, 214, 571 P.2d 196 (1977); (2) to protect "against adverse effects" to the public health, safety and welfare, RCW 90.58.020; *Nisqually Delta Ass'n v. DuPont,* 103 Wn.2d 720, 732, 696 P.2d 1222 (1985); and (3) to ensure that development along state shorelines and waters does not adversely affect the general public trust rights of "navigation and corollary rights incidental thereto." RCW 90.58.020; *see Portage Bay–Roanoke Park Comm'ty Coun. v. Shorelines Hearings Bd.,* 92 Wn.2d 1, 4, 593 P.2d 151 (1979). As to Orion's specific property, the SMA designated Padilla Bay a shoreline of statewide significance, RCW 90.58.030(2)(e)(ii)(E). The record persuasively establishes that Padilla Bay is subject to the public trust rights and that the public has an intense interest in prohibiting tideland uses that would endanger the ecological environment or threaten the fiscal integrity of the commercial fishing industry, a major contributor to the economic health and welfare of Washington's citizens.

Regulations safeguarding the public's interest in being protected from injurious uses would obviously be insulated from characterization as a taking. As the Supreme Court recognized in *Mugler,* and recently restated in *Keystone Coal Ass'n,* "'all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community". *Keystone Coal Ass'n,* 94 L. Ed. 2d at 492 (quoting *Mugler v. Kansas,* 123 U.S. 623, 665, 31 L. Ed. 205, 8 S. Ct. 273 (1897)). Thus, if, for example, Orion could make no reasonably profitable use of its property without injuring the public trust or the *public's* interest in health or in the environment, no compensable taking could have occurred. Likewise, if any profitable use of the tidelands would have harmed the critically important commercial fishing industry, the State could choose to protect the interest of "preponderant public concern" without having to pay compensation. *Miller v. Schoene,* 276 U.S. 272, 279, 72 L. Ed. 568, 48 S. Ct. 246 (1928) (no taking occurred when Virginia required diseased cedar trees be cut down to

protect critically important apple orchards).

On the other hand, if Orion's property was adaptable to aquaculture, then the Sanctuary's creation proximately caused the denial of all reasonably profitable use, and the SMA and the SCSMMP no longer merit insulation from Orion's takings challenge. As we have already explained, the Sanctuary's creation made it impossible for Orion to obtain a conditional use permit to pursue aquaculture on its property. *See Orion I*, at 459–60; see *supra* at 633. We have no doubt that the State created the Sanctuary in order to preserve and protect the vitally important role Padilla Bay plays in maintaining a healthy Washington. Nevertheless, application for a conditional use permit did not become futile because of the need to protect the public from harm. Rather, a permit could never issue because any reasonably profitable use was incompatible with use of the Sanctuary for research, education, and nonintensive recreation, the only preexisting uses in the area. *See Orion I*, at 459–60. As applied to Orion's property, the regulatory scheme's purpose was no longer to safeguard the public health or safety, but rather to protect the preexisting uses in the area. Consequently, if aquaculture was an economically viable use, the Sanctuary proximately caused the denial of a conditional use permit, and the State cannot "avoid the conclusion that a compensable taking had occurred by establishing that the denial of all use was insulated as a part of the State's authority to enact safety regulations." *First English Evangelical Lutheran Church*, 107 S. Ct. at 2384–85; *see also Maple Leaf Investors*, at 733.

Whether the state's regulatory regime merits insulation from characterization as a taking depends upon the resolution of a variety of factual disputes. Consequently, we remand for the trial court to determine, in light of the public trust doctrine, whether Orion's land was adaptable to any legally permissible, reasonably profitable uses, and if so whether the SMA and the SCSMMP or the Sanctuary's effect on the regulations proximately caused the denial of such uses.

## 2. Has a compensable taking occurred?

If the trial court determines that the State cannot claim insulation from Orion's takings challenge, a compensable taking may have occurred. Orion must demonstrate either that the regulations do not substantially advance a legitimate governmental purpose, *Nollan v. California Coastal Comm'n,* ___ U.S. ___, 97 L. Ed. 2d 677, 107 S. Ct. 3141 (1987), or that the limitations placed on the use of its property caused a sufficiently significant economic deprivation. *See Keystone Coal Ass'n,* 94 L. Ed. 2d at 492; *Maple Leaf Investors,* at 731–32. As in *Nollan,* Orion challenges the nexus between the public purpose and the application of the regulatory scheme to its property. In *Nollan,* the Supreme Court held that by requiring the property owner to grant the public an easement, local decision makers had sought to gain a public use without paying compensation. *Nollan,* 107 S. Ct. at 3150. Here, Orion claims that the regulatory regime sought to accomplish a "condemnation" without resort to the legally mandated process. Orion characterizes the SMA, the SCSMMP, and the willing seller approach to Sanctuary acquisition as reflecting a state policy to preserve Padilla Bay in its natural state, without using the more expensive condemnation route. We disagree.

Though the SMA and the SCSMMP evidence the State's attempt to preserve Padilla Bay, *see Orion* I, at 457, prior to the Sanctuary the regulations allowed for some economic uses consistent with the preservation goal.[27] While the Sanctuary may have triggered the alleged taking, we do not perceive use of the willing seller approach as an attempt to avoid condemnation proceedings. Tideland owners could either accept or reject the purchase offer without threat of a subsequent condemnation proceeding. Formulation of this strategy resulted from the State's belief that no taking occurred due to the continued viability of aquaculture and from the relatively small amount of acquisition money

---

[27]See our discussion *supra,* at footnotes 4 and 5. *See also Nisqually Delta Ass'n v. DuPont,* 103 Wn.2d 720, 729–33, 696 P.2d 1222 (1985).

available.[28] Furthermore, the State concluded that while aquaculture would be allowed, Orion could make no other use of its land that would not unreasonably harm the ecosystem. We find Orion's challenge to the nexus between the regulatory regime and the State's purpose without foundation.

A compensable taking may have occurred, however, if Orion suffered a significant economic deprivation as a result of the Sanctuary's effect on Orion's ability to make some present, reasonably profitable use of its property. The extent of the economic deprivation depends upon two factors: (1) the economic impact caused by the denial of any profitable use, *Keystone Coal Ass'n*, 94 L. Ed. 2d at 494–95; *Department of Natural Resources v. Thurston Cy., supra;* and (2) the extent to which the denial of profitable use interfered with reasonable, investment–backed expectations, *Keystone Coal Ass'n*, 94 L. Ed. 2d at 494–95.

Even assuming Orion's tidelands were adaptable to aquaculture, the extent of the regulation's economic impact depends upon more than the denial of any immediate profitable use. Property includes a bundle of rights with respect to the physical thing. The bundle includes the right to possession and to exclude others, the right to use and enjoyment, and the right to dispose of the thing itself. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435, 73 L. Ed. 2d 868, 102 S. Ct. 3164 (1982); *Lange v. State,* 86 Wn.2d 585, 590, 547 P.2d 282 (1976). Where an owner possesses a full bundle of property rights, the regulatory scheme's economic impact is determined by viewing the bundle in its entirety. *See Keystone Coal Ass'n,* 94 L. Ed. 2d at 496–97.

None of these "fundamental attributes of ownership" have been extinguished. *See Kaiser Aetna v. United*

---

[28]Throughout these proceedings Orion has claimed the State must pay, at minimum, $6 million for the tideland property, a value based on a use precluded by the public trust (farm value of $1,200 per acre). Yet, the total budget for Sanctuary acquisition was approximately $4 million.

*States,* 444 U.S. 164, 179–80, 62 L. Ed. 2d 332, 100 S. Ct. 383 (1979). Even if the State has denied Orion's right to make a present, reasonably profitable use of its property, the regulations continue to allow Orion to use its tidelands for education, research, and nonintensive recreation, *Orion I,* at 459; uses that other parties may consider extremely valuable. Orion's right to dispose of its property and to exclude others also remains unaffected. Thus, the significance of the economic deprivation suffered by Orion depends upon the effect the denial of all use had on the property's fair market value and Orion's ability to realize that value through a sale to a party other than the government. *See Florida Rock Indus., Inc. v. United States,* 791 F.2d 893 (Fed. Cir. 1986).

The trial court did not determine whether Orion's property retained a reasonable fair market value. The reasonableness of the retained fair market value depends upon whether the retained value approximates that which would have resulted if Orion had been permitted to make a legally permissible, possible and reasonably profitable use.[29] Unfortunately, we cannot determine from the record whether Orion has a possibility of realizing a fair market value through a sale of its property to a nongovernmental buyer. The State and Orion dispute the extent to which the Sanctuary impacted the market value and the record is silent as to whether Orion has a present possibility of a sale to a party other than the government. Resolution of these factual questions necessitates remand to the trial court.

As to the extent of the economic deprivation caused by interference with reasonable, investment–backed expectations, we conclude that remand is unnecessary. The record clearly demonstrates that if Orion developed any reason-

---

[29]This determination differs from that required when a party bases its takings claim solely on the effect a regulation has on property values, rather than on a denial of all profitable use. A "property value" takings claim requires a showing that a regulation destroyed the property's entire value, or only a bare residual value remains. *MacLeod v. County of Santa Clara,* 749 F.2d 541 (9th Cir. 1984); *see also Buttnick v. Seattle,* 105 Wn.2d 857, 862, 719 P.2d 93 (1986).

able investment–backed expectations, they extended only to the proposed dredge and fill projects, which the public trust precluded. Orion never made any property improvements based on an expectation of making a legally permissible use of the property. Although we find that the regulations did not interfere with Orion's investment–backed expectations, the significance of the economic impact remains undetermined and the subject of dispute among the parties. Therefore, summary judgment was improper. *See Wilson v. Steinbach,* 98 Wn.2d 434, 656 P.2d 1030 (1982). We remand for the trial court to determine the extent of the economic deprivation caused by the denial of all present, reasonably profitable uses.

3. The proffered compensation.

Like article 1, section 16, the fifth amendment to the United States Constitution "does not proscribe the taking of property; it proscribes taking without just compensation." *Williamson Cy. Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 194, 87 L. Ed. 2d 126, 105 S. Ct. 3108 (1985). Thus, even if we assume that the creation of the Sanctuary effected a regulatory taking, a constitutional violation does not result unless Orion establishes that the proffered compensation, if any, was not just. *Hamilton Bank,* 473 U.S. at 194; *MacDonald, Sommer & Frates v. Yolo Cy.,* 477 U.S. 340, 91 L. Ed. 2d 285, 294, 106 S. Ct. 2561 (1986). Local agencies charged with administering land–use regulation have a variety of compensation tools at their disposal including authorizing alterations, remitting taxes, and transferring development rights. *MacDonald, Sommer & Frates,* at 350. Here, however, the proffered compensation came in the form of an offer by the State to purchase the property for inclusion in the Sanctuary.

We recognize that allowing government entities to vindicate inverse condemnations by offers to purchase could be viewed as, in effect, putting a premium on avoiding the legislatively designed method for exercising eminent domain and its focus on fair procedures. *See* RCW Title 8. How-

ever, we have already rejected Orion's contention that the SMA, the SCSMMP, and the adoption of the willing seller strategy evidenced a state intent to accomplish a taking without resort to eminent domain procedures. Absent governmental intent to circumvent condemnation proceedings, the statutorily prescribed procedural protection will not be thwarted by considering the sufficiency of state offers to pay compensation when a subsequently filed action alleges a regulatory taking.

An eminent domain proceeding consists of three phases: adjudication of public use and necessity; determination of compensation; and payment of award with entry into possession. *State ex rel. Lange v. Superior Court*, 61 Wn.2d 153, 156, 377 P.2d 425 (1963). Where the claimant alleges an inverse condemnation by excessive regulation, a court implicitly makes a public use and necessity determination by finding that the regulation substantially advances a legitimate public purpose. Requiring the court to determine whether the proffered compensation is just provides protection equivalent to the second eminent domain determination. If the trial court determines that the compensation offered is not just, then a statutorily authorized damage proceeding would set the appropriate compensation. *See, e.g.*, RCW 8.04.092.

The State based its purchase offer on its consistently held view that the public trust doctrine, as implemented by the SMA and the SCSMMP, barred Orion's plan to dredge and fill the tidelands. Recognizing that the SMA, and later the SCSMMP, seriously affected Orion's development expectations, the State repeatedly offered to purchase Orion's tidelands for a market value based on use of the property for aquaculture. We have already rejected Orion's contention that the SMA, the SCSMMP, and the adoption of the willing seller strategy evidenced a State intent to avoid eminent domain procedures. Consequently, no unconstitutional taking has occurred if the State's final offer to purchase was just in light of the property's fair market value and if the State continues to honor its pur-

chase offer. As we have explained, a factual dispute exists concerning the fair market value of Orion's property in light of the public trust and other state and federal regulations applicable prior to the Sanctuary. Therefore, we remand for the trial court to determine whether the proffered compensation was just.

4. The appropriate remedy and measure of damages. The trial court has already ruled that the regulations effected a permanent, rather than a temporary, taking, and set the diminution of value caused by the Sanctuary's creation as the appropriate measure of damages. In challenging the trial court's characterization of the taking as permanent, the State argues that it should have the opportunity to cure any taking by amending the regulations to allow Orion a profitable use or by rescinding the Sanctuary. We agree.

Where a regulation results in a taking by denial of all use, the regulation is invalid, but the state and federal constitutions require the government to pay just compensation for the period during which the regulation was effective. *See First English Evangelical Lutheran Church,* 107 S. Ct. at 2389. Once a taking has been established, "the government retains the whole range of options already available—amendment of the regulation, withdrawal of the invalidated regulation, or exercise of eminent domain." *First English Evangelical Lutheran Church,* 107 S. Ct. at 2389. This view of the appropriate remedy conforms with our own nonregulatory inverse condemnation cases, where we have observed that when a taking is not complete, forcing the governmental entity to either condemn the land or abandon the public use is a particularly appropriate remedy. *Brazil v. Auburn,* 93 Wn.2d 484, 495, 610 P.2d 909 (1980).

We conclude that the trial court erred in characterizing the alleged taking as complete and permanent. If a taking by excessive regulation has occurred, the "damage" to Orion's property is temporary and reversible. We reject

Orion's contention that the State and County have acted so oppressively, and have so destroyed the value of the tidelands, that this court should view the taking as permanent and complete. *See, e.g., Althaus v. United States,* 7 Cl. Ct. 688 (1985). Cases such as *Althaus* do not apply under these circumstances. There, the claimant could not sell its land because the federal government had announced an intention to acquire the land for nearly 10 years, using the threat of condemnation to drive down the price. Here, the effects of the Sanctuary can be cured either by amending the regulations or by abandoning the Sanctuary.

If on remand the trial court determines that an unconstitutional, compensable taking has occurred, the court should proceed to the damage setting phase of its deliberations. The measure of damages must fully compensate Orion for what it has lost. *Lange v. State,* 86 Wn.2d 585, 590, 547 P.2d 282 (1976). We agree with the Supreme Court that the proper measure of damages for a "temporary" regulatory taking would be the leasehold value of the land for the period during which the regulation remained effective. *First English Evangelical Lutheran Church,* 107 S. Ct. at 2388.

E

Because material factual issues remain unresolved as to each component of the regulatory takings test, summary judgment on the regulatory takings claim was improper. We therefore remand to the trial court to make the following factual findings:

1. In light of the public trust doctrine, did Orion ever have a reasonably profitable use that was economically and functionally adaptable to the tideland property;

2. If Orion had one or more reasonably profitable uses, did the original enactment of the SMA and the SCSMMP proximately cause the denial of *all* such uses, thereby insulating the State from a takings challenge; or did a profitable use remain (for example, aquaculture), making the creation of the Sanctuary the proximate

cause of the alleged taking;

3. If the Sanctuary was the proximate cause, did a compensable taking occur, that is did the denial of all present profitable uses prevent Orion from realizing the property's reasonable fair market value through a sale to a nongovernmental buyer; and

4. If a compensable taking occurred, did the State offer just compensation?

If an unconstitutional taking has occurred, the trial court should set damages, but in a manner that seeks to protect Orion from incremental decisionmaking. The decision of whether to cure the taking or maintain the status quo by the exercise of eminent domain is a legislative prerogative. Therefore, if the State chooses to cure the taking by amending the regulations to allow Orion a profitable use, the trial court should review the State's proposed changes to determine whether the temporary taking would in fact be cured. Regardless of whether the State chooses to cure by amendment or rescission, or chooses to exercise its power of eminent domain, an unconstitutional regulatory taking triggers the procedures for awarding attorney fees and costs pursuant to RCW 8.25.070.

## IV
### OTHER TAKING CLAIMS

In addition to a taking by excessive regulation, Orion claimed a taking under two additional theories: physical invasion and oppressive precondemnation conduct. The trial court concluded that no material facts were in dispute and dismissed both theories on summary judgment. We agree.

## A
### TAKING BY PHYSICAL INVASION

A per se taking occurs whenever government causes its agents or the public to regularly use or permanently occupy property known to be in private ownership. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 427 n.5, 73 L. Ed. 2d 868, 102 S. Ct. 3164 (1982). Orion claims it

has produced sufficient evidence of a physical invasion to withstand summary judgment. In support of its claim, Orion points to promotional materials prepared during the initial stages of Sanctuary development, and still available today, depicting all of Padilla Bay, including Orion's property, as within the Sanctuary. Orion also argues that a physical invasion occurs because its property is part of the same ecological unit as the State's property.

 Orion's claim is untenable. At minimum, a plaintiff must demonstrate a chronic and unreasonable pattern of behavior by the government to support a claim for inverse condemnation by physical invasion. *Schultz v. United States,* 5 Cl. Ct. 412 (1984). The record, however, contains no specific instances of trespass caused by the State, which has taken affirmative steps to prevent trespass. Clerk's Papers, at 1320. We agree with the trial court that the "undisputed facts demonstrate no physical invasion of plaintiff's tidelands by defendants." Clerk's Papers, at 2126.

## B
### TAKING BY OPPRESSIVE PREACQUISITION CONDUCT

Orion cites no Washington case law to support its claim that the government can unconstitutionally take private property by "oppressive preacquisition conduct." Apparently, California has recognized a cause of action for inverse condemnation when a "diminution in market value resulted from 'unreasonably delaying eminent domain action following an announcement of intent to condemn or by other unreasonable conduct prior to condemnation . . .'" *Jones v. People ex rel. Dep't of Transp.,* 22 Cal. 3d 144, 151, 583 P.2d 165, 148 Cal. Rptr. 640 (1978) (quoting *Klopping v. Whittier,* 8 Cal. 3d 39, 500 P.2d 1345, 104 Cal. Rptr. 1 (1972)). In support of our recognizing this new cause of action, Orion cites state statutes that set policy guidelines for agencies acquiring real property during the course of condemnation proceedings. RCW 8.26.180(7), (8). "The acquiring agency shall not intentionally make it necessary

for an owner to institute legal proceedings to prove the fact of the taking of his real property." RCW 8.26.180(8).

At this time, we do not choose to recognize this new cause of action. Even if we had, Orion has offered no evidence capable of withstanding summary judgment. Here there has been no announcement of intent to condemn and no condemnation proceedings have been instituted. Moreover, we find a lack of credibility in Orion's claim that the State circumvented the constitution and the Legislature's guidelines under the guise of a willing seller concept. As we have already explained, Ecology made a prudent choice in adopting a "willing seller" approach, rather than condemnation. As to other examples of oppressive conduct, the trial court correctly concluded that "the undisputed facts demonstrate . . . no abusive preacquisition activity on the part of the defendants which would amount to an unconstitutional taking of [Orion's] property." Clerk's Papers, at 2126.

## V
### FEDERAL CIVIL RIGHTS CLAIM

Orion also brought an action under 42 U.S.C. § 1983. At trial, the court granted the State and County summary judgment on the § 1983 claim. An action for inverse condemnation caused by excessive governmental regulation is cognizable under 42 U.S.C. § 1983. *See Williamson Cy. Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 194, 87 L. Ed. 2d 126, 105 S. Ct. 3108 (1985). While the trial court did not explain its dismissal of Orion's § 1983 action, it apparently relied upon *Hamilton Bank*. There, the Supreme Court explained that "if a State provides an adequate procedure for seeking just compensation," a claimant may not file a § 1983 takings claim "until it has used the [state] procedure and been denied just compensation." *Hamilton Bank*, 473 U.S. at 195. At minimum, we read *Hamilton Bank* as requiring Orion to complete the available and adequate Washington inverse condemnation proceedings before filing a § 1983 action

alleging an unconstitutional taking by excessive regulation. 473 U.S. at 194 n.13. Consequently, the trial court correctly dismissed Orion's § 1983 claim as not yet ripe.

CONCLUSION

Because material factual issues remained unresolved, summary judgment on Orion's regulatory takings claim was improper. Specifically, we dismiss the County, which acted solely in its capacity as the State's agent. As to the State, we remand for the trial court to make several factual determinations concerning the public trust doctrine and the various components of the federal regulatory takings test. We affirm the trial court on all other issues.

PEARSON, C.J., BRACHTENBACH, CALLOW, GOODLOE, and DURHAM, JJ., and WILLIAMS, J. Pro Tem., concur.

ANDERSEN, J., concurs in the result.

DORE, J. (dissenting)—While I have reservations concerning the majority's analysis of substantive due process violations and regulatory takings, I believe the court need not reach these issues. The majority holds that Orion's takings claim is ripe for review. Majority, at 633. I disagree. Neither Skagit County nor the State has ever issued a final decision regarding the application of the Shoreline Management Act of 1971 (SMA), the Skagit County Shoreline Management Program (SCSMMP) or the Padilla Bay Estuarine Sanctuary (Sanctuary) to Orion's property. Absent a final decision by the County or State as to how these regulations apply to Orion's property, a proper determination of whether a taking has occurred cannot be made.

The United States Supreme Court has consistently held that a regulatory takings claim is not ripe until the governmental entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue. *MacDonald, Sommer & Frates v. Yolo Cy.*, 477 U.S. 340, 348–50, 91 L. Ed. 2d 285, 294–95, 106 S. Ct. 2561 (1986); *Williamson Cy. Regional Planning Comm'n v. Hamilton Bank*, 473 U.S.

172, 186, 87 L. Ed. 2d 126, 105 S. Ct. 3108 (1985). Generally, to state a regulatory takings claim a property owner must first establish that the regulation has in substance "taken" property—that is, that the regulation "goes too far". *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 67 L. Ed. 322, 43 S. Ct. 158 (1922); *Hamilton Bank,* at 186. Determining whether a regulation has gone "too far" depends, in significant part, upon an analysis of the economic impact of the challenged regulation and the extent to which it interferes with reasonable investment–backed profit expectations. *Hamilton Bank,* at 190–91. It is impossible to accurately evaluate these factors "until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question." *Hamilton Bank,* at 191.

Here, Orion has never once filed for a substantial development permit or a variance. Neither the County nor the State has ever been given an opportunity to determine how the SMA, SCSMMP or the Sanctuary applies to Orion's property. Thus, we have no way of knowing whether the harm inflicted by these regulations is severe enough to lead to the conclusion that they "go too far". Until we know the parameters of what Orion can and cannot do with its property, a regulatory takings claim is premature.

The majority opinion concludes that Orion's claim is postured for review because an application for an aquaculture conditional use permit would be futile. The majority assumes that our earlier decision in *Orion Corp. v. State,* 103 Wn.2d 441, 459, 693 P.2d 1369 (1985) which held that the existence of the Sanctuary would require denial of such a permit is still correct. I disagree. The trial court was presented with evidence of changed circumstances that warrant a reappraisal of the possible uses of Orion's property. In particular, an affidavit from the section head of the Shoreland Management Section, Washington State Department of Ecology, concluded that aquaculture would be permitted in Padilla Bay. The changed circumstances indicate that aquaculture may not only be consistent with the gen-

eral purpose of the SMA; but also, aquaculture may be compatible with the existence of the Sanctuary.

Furthermore, while our original decision in *Orion* seemed to indicate that Orion could not receive a variance, the changed circumstances may also allow Orion to receive such a variance. If this were possible, then Orion could obtain a profitable use of its property.[30]

### CONCLUSION

I believe Orion's regulatory taking claim is premature. Without a final administrative decision on the effect of the regulations at issue here on Orion's property, it is impossible to tell whether the property has retained any reasonable beneficial use or whether investment–backed expectations have been destroyed. Accordingly, I would reverse the trial court's decision granting Orion's motion for summary judgment on its regulatory takings claim.

---

[30]I further note that while the specter of financial liability may prevent a county from enacting certain beneficial land use regulations, a variance procedure may ameliorate this risk. The Skagit County ordinances allowed for a variance whenever to do otherwise could result in a "taking" on the property owner concerned. SCSMMP § 10.03(e). Had the State argued this again in this case, the result may have differed. In any event, I still believe a remand on this issue would be equitable.